# COLUMBIA STEEL CASTINGS CO.,
*Petitioner,*

*and*

# COLUMBIA SLOUGH DEVELOPMENT CORPORATION,
*Intervenor - Petitioner Below,*

*v.*

# CITY OF PORTLAND,
*Respondent.*

## (LUBA 89-058; CA A66052)

799 P2d 1142

Jay T. Waldron, Portland, argued the cause for petitioner. With him on the brief were Mildred J. Carmack, Steven W. Abel and Schwabe, Williamson & Wyatt, Portland.

Ruth M. Spetter, Portland, argued the cause for respondent. With her on the brief was Adrianne Brockman, Portland.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioner seeks review of LUBA's affirmance of the City of Portland's comprehensive plan and zoning map amendments, by which certain property in the Columbia Corridor, including petitioner's, was redesignated and made subject to an environmental conservation overlay zone that might restrict the industrial uses that petitioner conducts on its property. Petitioner contends that the process by which the city arrived at its decisions violated LCDC's Goal 5 implementing rule, OAR 660-16-000 *et seq*, because the city's identification of uses that conflict with Goal 5 resources and its analysis of economic, social, environmental and energy (ESEE) consequences were not as site-specific as the rule requires.

The Columbia Corridor is a 14,000 acre area that lies along the southern shore of the Columbia River from the Willamette River to N.E. 185th Avenue. It contains prime resource areas, along with existing industrial operations and land that is zoned industrial. The city divided the corridor into five subareas and 36 identified resource sites. Site 55, where petitioner's foundry is located, is one of those sites and consists of 1,867 acres. Although the city's studies and documentation contained generalized conflicting use and ESEE analyses for the corridor as a whole, and also contained some analysis that was more localized, they did not identify conflicting uses in or undertake ESEE analysis for site 55 itself. Rather, the city applied the areawide data in making its specific Goal 5 program decision for site 55. Petitioner argues that it, therefore, did not comply with the implementing rule. The city contends, and LUBA agreed, that the site-specific analysis demanded by petitioner was not required, that the regional and areawide analysis that it did perform was adequate to enable it to make and explain programmatic decisions about site 55 and that that is all that OAR 660-16-000 *et seq* requires.

OAR 660-16-000(2) provides:

"A 'valid' inventory of a Goal 5 resource under subsection (5)(c) of this rule must include a determination of the location, quality, and quantity of each of the resource sites. Some Goal 5 resources (e.g., natural areas, historic sites, mineral and aggregate sites, scenic waterways) are more site-specific than others (e.g., groundwater, energy sources). For site-specific

resources, determination of *location* must include a description or map of the boundaries of the resource site and of the impact area to be affected, if different. For non-site-specific resources, determination must be as specific as possible." (Emphasis in original.)

After resource sites are identified, local governments must identify uses that conflict with the resources, in accordance with OAR 660-16-005:

"It is the responsibility of local government to identify conflicts with inventoried Goal 5 resource sites. This is done primarily by examining the uses allowed in broad zoning districts established by the jurisdiction (e.g., forest and agricultural zones). A conflicting use is one which, if allowed, could negatively impact a Goal 5 resource site. Where conflicting uses have been identified, Goal 5 resource sites may impact those uses. These impacts must be considered in analyzing the economic, social, environmental and energy (ESEE) consequences[.]"

If conflicting uses exist, OAR 660-16-005(2) defines the ESEE analysis that must be applied:

"Determine the Economic, Social, Environmental, and Energy Consequences: If conflicting uses are identified, the economic, social, environmental and energy consequences of the conflicting uses must be determined. Both the impacts on the resource site and on the conflicting use must be considered in analyzing the ESEE consequences. The applicability and requirements of other Statewide Planning Goals must also be considered, where appropriate, at this stage of the process. A determination of the ESEE consequences of identified conflicting uses is adequate if it enables a jurisdiction to provide reasons to explain why decisions are made for specific sites."

OAR 660-16-010 governs the programmatic options that local governments may select after performing the ESEE analysis. Here, apparently, the city chose to permit some conflicting uses and to give some protection to the resources within the Columbia Corridor as a whole, pursuant to OAR 660-16-010(3):

"Limit Conflicting Uses: Based on the analysis of ESEE consequences, a jurisdiction may determine that both the resource site and the conflicting use are important relative to each other, and that the ESEE consequences should be balanced so as to allow the conflicting use but in a limited way so as to protect the resource site to some desired extent. To

implement this decision, the jurisdiction must designate with certainty what uses and activities are allowed fully, what uses and activities are not allowed at all and which uses are allowed conditionally, and what specific standards or limitations are placed on the permitted and conditional uses and activities for each resource site. Whatever mechanisms are used, they must be specific enough so that affected property owners are able to determine what uses and activities are allowed, not allowed, or allowed conditionally and under what clear and objective conditions or standards. Reasons which support this decision must be presented in the comprehensive plan, and plan and zone designations must be consistent with this decision."

The city relies on the concluding sentence in OAR 660-16-005(2) and argues that neither the identification of conflicting uses nor the ESEE analysis must be specific to a particular resource site if a less localized analytical approach "enables a jurisdiction to provide reasons to explain why decisions are made for specific sites." LUBA's view was the same. Relying on the language cited by the city and on the provision in OAR 660-16-005 that conflicting uses are to be identified "primarily by examining the uses allowed in broad zoning districts," LUBA concluded that the rule contains no across-the-board requirement of site-specificity in connection with conflict identification and that neither the "goal nor the * * * rule pinpoints the level of specificity required in an ESEE analysis." LUBA then held that the areawide analytical approach that the city followed was sufficient to enable it to explain its program for site 55.

Petitioner's argument is based, in part, on the fact that various sections of OAR 660-16-000 *et seq* "carefully distinguish by usage and context between a 'resource site' and a 'site' which is a smaller and more specific part of the 'resource site.'" Petitioner then attempts to demonstrate a narrowing process, within the rule itself, by which the identification of resource sites is subject to a very flexible specificity requirement, while the word "sites" in the conflicting use and ESEE provisions of the rule is frequently prefaced by the words "specific" or "particular." Beyond its linguistic argument, petitioner appears to make the implicit point that the rule should be applied in a common sense manner and that it is contrary to common sense to analyze the conflicting use and ESEE consequences for specific sites without particularizing what uses and consequences occur on those sites.

■■ It is unclear whether petitioner is arguing that the rule contemplates a conflict identification and resolution process that is conducted in areas that are smaller than the identified resource sites themselves or arguing that the conflict and ESEE considerations must coincide with identified resource sites rather than being based on larger areas in which the sites are located. There is, of course, no necessary inconsistency between those alternatives, and it is unnecessary for us to choose between them in this opinion. *See* notes 2 and 3, *infra.* The general point of petitioner's argument is that the city misapplied the rule and that LUBA misconstrued it, as a matter of law, by concluding that it permits programmatic decisions for specific locations to be based on the characteristics of an enormous area in which they are contained, with no particularized attention to the conflicts or ESEE consequences that are peculiar to the locations themselves.

We agree with that general point.[1] The rule contains only a very general site-specificity requirement for the identification of resource sites, in terms of either size or location; they need only be as specific as the nature and whereabouts of the resource allow. As petitioner argues, the terminology of the rule becomes more locationally specific in the context of the conflicting use, ESEE and programmatic selection provisions. That linguistic structure is consistent with the reality in which the rule is supposed to operate.

Extensive resource areas may encompass territory that has many different levels and kinds of conflicting uses, with correspondingly different levels and kinds of ESEE consequences. In this case, the city has demonstrated that there are substantially common or recurrent resource characteristics throughout the 14,000 acre area; however, the conflicting uses and ESEE consequences in different parts of that area have not been shown to be similar. Petitioner correctly notes that the city's areawide findings concerning the economic impact of resource preservation on conflicting commercial uses are tenuous to the point of meaninglessness. The city's findings, which LUBA endorsed as satisfactory, include:

"Industries which are locationally dependent, however,

---

[1] The specifics of petitioner's argument have varied from time to time. Before LUBA and in its brief here, petitioner suggested that tax lot or parcel specificity might be required.

may face shortages if constraints are not removed from certain lands.

"* * * * *

"In summary, adverse economic impact will result when insufficient lands are available for a needed industrial or commercial activity."

Those statements are mere truisms. They are of no assistance in identifying particular conflicts, analyzing their consequences or developing a program to resolve them. Even given the city's interpretation that OAR 660-16-005(2) requires only an adequate analysis to enable a locality to explain its decisions for specific sites, the city's analysis does not achieve that goal with respect to site 55. The basic problem with the city's interpretation is that it presupposes that an ESEE analysis *can* be adequate to explain specific site decisions without specific consideration of the conflicts and their consequences on the site. It is correct that the end result that the rule mandates is an adequate data and analytical base to explain decisions for specific sites; it is not correct, however, that that base can be developed without any reference to what happens on those sites.

We hold that LUBA misconstrued OAR 660-16-000 *et seq* as having no bearing on how localized the conflict identification and ESEE analysis must be under the circumstances of this case.[2] Therefore, we reverse and remand the order as unlawful in substance under ORS 197.850(9)(a). It is for LUBA to determine on remand the precise site-specificity requirements that are applicable to these land use decisions under the rule.[3]

Reversed and remanded.

---

[2] Obviously, there are at least some circumstances in which the identified resource site and the appropriate area for the conflict and ESEE analyses will coincide. An extreme example would be a small site with uniform resource characteristics and a single uniformly distributed conflicting use.

[3] We are aware that the parties' arguments before LUBA may have joined issue at the extreme. *See* note 1, *supra.* To whatever extent LUBA considered that it was rejecting the narrow argument that the analysis must proceed on a "tax lot by tax lot basis," we agree that that degree of specificity is unnecessary.