Argued and submitted May 8, 1991, decision of Court of Appeals affirmed in part; decision of Land Use Board of Appeals reversed in part and case remanded to Land Use Board of Appeals for further proceedings October 22, 1992

## COLUMBIA STEEL CASTINGS CO.
*Respondent on Review,*

*and*

## COLUMBIA SLOUGH
## DEVELOPMENT CORPORATION,
*Intervenor - Respondent on Review,*

*v.*

## CITY OF PORTLAND,
*Petitioner on Review.*

(LUBA 89-058; CA A66052; SC S37716)

840 P2d 71

Ruth Spetter, Senior Deputy City Attorney, Portland, argued the cause and filed the petition for petitioner on review. With her on the petition was Jeffrey L. Rogers, City Attorney, Portland.

James T. Waldron, Portland, argued the cause and filed the response for respondent on review. With him on the response were Mildred J. Carmack and Steven W. Abel of Schwabe, Williamson & Wyatt, Portland.

John T. Bagg, Assistant Attorney General, filed a brief for *amicus curiae* Land Conservation and Development Commission. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General.

GILLETTE, J.

## GILLETTE, J.

In this land use case, the Land Use Board of Appeals (LUBA) affirmed amendments by the City of Portland (City) to its comprehensive plan and zoning map. The amendments applied an "environmental conservation overlay zone" to property in an area known as the Columbia Corridor, including property owned by Columbia Steel Castings Co. (Columbia Steel). The effect of the zone is to limit future uses that may be made of the property within the zone. After unsuccessfully seeking relief from LUBA, Columbia Steel petitioned for judicial review, arguing that City's manner of applying the environmental conservation overlay zone violated Oregon Land Use Goal 5[1] and the regulations that implement the Goal because, *inter alia*, City failed to make site-specific analyses of the economic, social, environmental, and energy (ESEE) consequences of applying the conservation overlay zone designation to property such as that owned by Columbia Steel.

The Court of Appeals agreed with Columbia Steel that, under the applicable land use rules, City's ESEE analyses had to be more site-specific than City had made them. The court remanded the case to LUBA with instructions to that agency "to determine * * * the precise site-specificity requirements that are applicable to these land use decisions under [the applicable rules]." *Columbia Steel Castings Co. v. City of Portland*, 104 Or App 244, 250, 799 P2d 1142 (1990). We allowed City's petition for review and now modify the decision of the Court of Appeals to the extent set forth below.

The area around which the present dispute centers is a part of the Columbia Corridor, a 14,000-acre area located

---

[1] The "environmental conservation overlay zone" in the present case is a zoning and mapping device used by City to designate a large area that contains several Goal 5 resource sites within it. Goal 5 is designed to protect, among other things, open spaces and natural resources. It requires that local governments first inventory the location, quality, and quantity of these resources. Next, the local governments are required to identify potential uses in each area containing Goal 5 resources that may conflict with the preservation of the Goal 5 resources. The local governments then must assess the economic, social, environmental, and energy (ESEE) consequences of allowing or prohibiting the conflicting uses. Finally, the local governments must develop programs to protect the identified Goal 5 resources. The Goal and its requirements are quoted in part and discussed further in *1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 303 Or 430, 433-35, 737 P2d 607 (1987).

primarily within Portland and running east along the southern shore of the Columbia River from the Willamette River to N.E. 185th Avenue. The area includes natural resource areas, existing industrial operations, and land that is zoned for industrial use. In its present rezoning action, City divided the Corridor into five sub-areas. Pursuant to OAR 660-16-000,[2] City also identified and inventoried 36 "resource sites" within the Corridor. Columbia Steel's property lies within one of those resource sites, Site 55. Site 55 contains 1,867 acres and encompasses the Smith and Bybee Lakes, an environmentally important wetland area. Columbia Steel is located on the bank of a watercourse called the Columbia Slough. The Slough runs the length of the Corridor and is connected to Smith and Bybee Lakes.

Columbia Steel has not questioned the permissibility of designating Site 55 as a resource site. However, Columbia Steel asserted both to LUBA and to the Court of Appeals that City had failed to perform properly the next steps in the Goal 5 resource protection process after identification of the resource, *viz.*, identification of conflicting uses and performance of an ESEE analysis of the impact of the resource and of the conflicting use on each other, as required by OAR 660-16-005. That rule provides:

> "It is the responsibility of local government to identify conflicts with inventoried Goal 5 resource sites. This is done primarily by examining the uses allowed in broad zoning districts established by the jurisdiction (e.g., forest and agricultural zones). A conflicting use is one which, if allowed, could negatively impact a Goal 5 resource site. Where conflicting uses have been identified, Goal 5 resource sites may impact those uses. These impacts must be considered in analyzing the economic, social, environmental and energy (ESEE) consequences:
>
> "(1) Preserve the Resource Site: If there are no conflicting uses for an identified resource site, the jurisdiction must adopt policies and ordinance provisions, as appropriate, which insure preservation of the resource site.
>
> "(2) Determine the Economic, Social, Environmental, and Energy Consequences: If conflicting uses are identified,

---

[2] The complete text of OAR 660-16-000 is set out in the Appendix to this opinion.

the economic, social, environmental and energy conse-
quences of the conflicting uses must be determined. Both the
impacts on the resource site and on the conflicting use must
be considered in analyzing the ESEE consequences. The
applicability and requirements of other Statewide Planning
Goals must also be considered, where appropriate, at this
stage of the process. A determination of the ESEE conse-
quences of identified conflicting uses is adequate if it enables
a jurisdiction to provide reasons to explain why decisions are
made for specific sites."

LUBA ruled that City's conflicting use and ESEE
findings, although those findings were made on an area,
rather than on a resource-site-by-resource-site, basis, none-
theless were sufficiently detailed to meet the requirements of
OAR 660-16-005. The Court of Appeals reversed, holding that
City's ESEE findings were not sufficiently location-specific to
satisfy the rule. As noted, the Court of Appeals then
remanded the case to LUBA to determine just how specific
City's findings would have to be to satisfy the requirements of
the rule.

City argues that what it already has done with
respect to conducting conflicting use and ESEE reviews for
the five sub-areas of the Columbia Corridor is adequate to
meet the requirements of OAR 660-16-005. This argument
has two parts, a part about nomenclature and a part about
specificity.

■     Concerning the nomenclature used in the pertinent
rule, OAR 660-16-005, City argues (and *amicus* Land Conser-
vation and Development Commission agrees) that the refer-
ences in OAR 660-16-005 and throughout the Goal 5
implementing rules to "resource sites," "sites," "particular
sites," and "specific sites" all refer to *resource sites*, not to
smaller parcels (such as tax lots) within a resource site. We
agree with this proposition, for two reasons.

First, even a casual reading of the Goal 5 implement-
ing rules, OAR 660-16-000 *et seq*, shows that the foregoing
words and phrases have been used interchangeably through-
out. For example, OAR 660-16-000(5)(a) to (c), which concern
identification of resource sites, provide:

"Based on the data collected, analyzed and refined by the
local government, as outlined above, a jurisdiction has three

basic options:

"(a) Do Not Include on Inventory: Based on information that is available on location, quality and quantity, the local government might determine that a particular *resource site* is not important enough to warrant inclusion on the plan inventory, or is not required to be included in the inventory based on the specific Goal standards. No further action need be taken with regard to these *sites*. The local government is not required to justify in its comprehensive plan a decision not to include a *particular site* in the plan inventory unless challenged by the Department, objectors or the Commission based upon contradictory information.

"(b) Delay Goal 5 Process: When some information is available, indicating the possible existence of a *resource site*, but that information is not adequate to identify with particularity the location, quality and quantity of the *resource site*, the local government should only include *the site* on the comprehensive plan inventory as a special category. The local government must express its intent relative to the *resource site* through a plan policy to address that *resource site* and proceed through the Goal 5 process in the future. The plan should include a time-frame for this review. Special implementing measures are not appropriate or required for Goal 5 compliance purposes until adequate information is available to enable further review and adoption of such measures. The statement in the plan commits the local government to address the *resource site* through the Goal 5 process in the post-acknowledgment period. Such future actions could require a plan amendment.

"(c) Include on Plan Inventory: When information is available on location, quality and quantity, and the local government has determined *a site* to be significant or important as a result of the data collection and analysis process, the local government must include *the site* on its plan inventory and indicate the location, quality and quantity of the *resource site* (see above). Items included on this inventory must proceed through the remainder of the Goal 5 process."

(Emphasis added.)

OAR 660-16-000(5) is most easily and sensibly read as outlining what happens to "resource sites," depending on their characteristics. It is difficult to imagine what type of site, other than a resource site, could be meant by this rule. In

fact, Columbia Steel does not suggest that the words are referring to different types of sites in this particular rule.

■■ The second reason why we accept City's nomenclature argument is that there is no usage or indication in other portions of OAR 660-16-000 *et seq* suggesting that similar words are intended to have a different meaning, even in those rules that do not have resource sites as their principal focus. Generally, and in the absence of some specific indication of a contrary intent, terms are read consistently throughout a statute. *See Knapp v. City of North Bend*, 304 Or 34, 41, 741 P2d 505 (1987) ("Absent any indication to the contrary, we assume that statutory terms have the same meaning throughout a statute"). The same principle may be applied to discrete sets of administrative rules that deal with a particular topic, such as the rules involved in this case. We therefore conclude that all references to "sites" in the pertinent portions of the Goal 5 implementing rules refer to "resource sites."

■ This brings us to the specificity portion of City's argument. City contends that, although it has chosen to focus on the five sub-areas of the Corridor rather than on smaller areas of land, its conflicting use and ESEE findings nonetheless are sufficient to satisfy the requirements of OAR 660-16-005. City bases its argument on the final sentence of that rule, which states that an ESEE analysis is "adequate if it enables a jurisdiction to provide reasons to explain why decisions are made for specific sites."

As already explained, the phrase "specific sites" in that sentence refers to specific *resource* sites. City argues that area-wide ESEE findings nonetheless can be adequate to explain why a decision was made for a specific resource site. We think, however, that the wording of the sentence refutes that argument. If a local jurisdiction is to be able to "explain why" certain ESEE decisions were "made for specific sites," the premise must be that there was at some point a matchup between evidence and the site, including conflicting use and ESEE evidence. If there were any doubt about this, it disappears in light of the requirement, found elsewhere in OAR 660-16-005, that "the impacts [of any conflicting uses] *on the resource site*" must be considered. OAR 660-16-005(2)

(emphasis added). OAR 660-16-005 requires that a conflicting use and an ESEE analysis be done for each resource site.

Our holding does not answer the question of *how* specific either a conflicting use analysis or the resulting ESEE analysis must be. Although the wording of OAR 660-16-005 does not require that an analysis be performed for areas smaller than each resource site, this alone does not establish the level of specificity that may be required. For example, City argues that identification of conflicting uses — the step that makes the resulting ESEE analysis possible — may be done in very broad strokes. City relies for this argument on the statement at the beginning of OAR 660-16-005 that identifying conflicting uses "is done primarily by examining the uses allowed in broad zoning districts established by the jurisdiction." However, that sentence describes only the first step of a *process* described by OAR 660-16-005 and related rules, not an end result.

■     It may be that, to a certain extent, the parties have been missing the point of the rule regarding ESEE analyses by placing their emphasis on specificity of locations of resource sites and of conflicting uses. An ESEE analysis must consider the impact of the resource site on the conflicting use and the impact of the conflicting use on the resource site, it is true. OAR 660-16-005(2). But, unless both the resource site and the conflicting uses are described with sufficient particularity, the ESEE analysis cannot begin. And, even when the resource site and the conflicting uses are independently and adequately described, the result is not yet an ESEE analysis. An ESEE analysis describes the *interaction* of the two phenomena, *i.e.*, the impact that each has on the other. *See 1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 303 Or 430, 434-35, 737 P2d 607 (1987) (describing process).

■     The Goal 5 implementing rules contemplate that resource site and conflicting use identification and ESEE analysis will be an ongoing process, subject to adjustment as new information appears. For example, OAR 660-16-020(2) states that, "[a]s the Goal 5 process progresses and more specificity about the nature of resources, identified conflicting uses, ESEE consequences and implementing measures is known, notice and involvement of affected parties will become more meaningful." And OAR 660-16-010 permits

certain actions, "assuming [that] there is adequate information on the * * * nature of the conflicting use." If all that were necessary to complete the identification of conflicting uses were to scan the zoning maps, as City's argument would appear to suggest, it is difficult to imagine a situation in which there would not be adequate information on the nature of any conflicting use from the outset of a planning process. Clearly, the rules contemplate more than City considers to be necessary.

As noted, the end result of the process is supposed to be a balancing of the impacts that the resource site and the conflicting use have on each other. Only then can a jurisdiction make a final decision whether to protect a resource site totally, or partially, or instead to allow the conflicting use without restriction. *See* OAR 660-16-010 (describing final evaluation and choices); *1000 Friends of Oregon v. LCDC (Tillamook Co.), supra*, 303 Or at 435 (same). That balancing process cannot be adequate, under the Goal 5 implementing rules, unless the identification of actual and conflicting uses is specific to each resource site.

■ · In conclusion, we hold that the Goal 5 implementing rules require that an ESEE analysis contain enough information on·impacts that resource sites and conflicting uses will have on each other to permit the responsible jurisdiction to have "reasons to explain why decisions are made for specific [resource] sites." The reasons need be given only if a particular decision is challenged, but the reasons must *exist* at the time the land use decision is made. The reasons cannot exist if the local government's ESEE study was never sufficiently detailed. LUBA's order stating that area-wide findings were adequate thus was unlawful in substance. ORS 197.850 (9)(a). The Court of Appeals was correct in so holding.

■ One procedural issue remains. The Court of Appeals remanded this case to LUBA "to determine on remand the precise site-specificity requirements that are applicable to these land use decisions under the rule." *Columbia Steel Castings Co. v. City of Portland, supra*, 104 Or App at 250. To the extent that holding requires that LUBA make rules concerning site-specificity, it is in error. LUBA is not a rule-making body. The Land Conservation and Development Commission, not LUBA, makes the goal-implementing rules.

However, remand to LUBA was appropriate for another reason. As noted, City suggests that, even if the law requires a more detailed ESEE assessment than that for which City argues, City's analysis vis-a-vis Site 55 is sufficient to meet the more exacting standard that a conflicting use and an ESEE analysis be done for each resource site. That is a judgment for LUBA to make in the first instance. The case is remanded to LUBA for reconsideration under the correct legal standard.

The decision of the Court of Appeals is affirmed, in part on different grounds. The decision of the Land Use Board of Appeals is reversed in part. The case is remanded to the Land Use Board of Appeals for further proceedings.

## APPENDIX

### OAR 660-16-000 provides:

"(1)   The inventory process for Statewide Planning Goal 5 begins with the collection of available data from as many sources as possible including experts in the field, local citizens and landowners. The local government then analyzes and refines the data and determines whether there is sufficient information on the location, quality and quantity of each resource site to properly complete the Goal 5 process. This analysis also includes whether a particular natural area is 'ecologically and scientifically significant,' or an open space area is 'needed,' or a scenic area is 'outstanding,' as outlined in the Goal. Based on the evidence and local government's analysis of those data, the local government then determines which resource sites are of significance and includes those sites on the final plan inventory.

"(2)   A 'valid' inventory of a Goal 5 resource under subsection (5)(c) of this rule must include a determination of the location, quality, and quantity of each of the resource sites. Some Goal 5 resources (e.g., natural areas, historic sites, mineral and aggregate sites, scenic waterways) are more site-specific than others (e.g., groundwater, energy sources). For site-specific resources, determination of *location* must include a description or map of the boundaries of the resource site and of the impact area to be affected, if different. For non-site-specific resources, determination must be as specific as possible.

"(3)   The determination of *quality* requires some consideration of the resource site's relative value, as compared to other examples of the same resource in at least the jurisdiction itself. A determination of *quantity* requires consideration of the relative abundance of the resource (of any given quality). The level of detail that is provided will depend on how much information is available or 'obtainable.'

"(4)   The inventory completed at the local level, including option 5(a), (b), and (c) of this rule, will be adequate for Goal compliance unless it can be shown to be based on inaccurate data, or does not adequately address location, quality or quantity. The issue of adequacy may be raised by the Department or objectors, but final determination is made by the Commission or the Land Use Board of Appeals as provided by law.

"(5)   Based on the data collected, analyzed and refined by the local government, as outlined above, a jurisdiction has

three basic options:

"(a) Do Not Include on Inventory: Based on information that is available on location, quality and quantity, the local government might determine that a particular resource site is not important enough to warrant inclusion on the plan inventory, or is not required to be included in the inventory based on the specific Goal standards. No further action need be taken with regard to these sites. The local government is not required to justify in its comprehensive plan a decision not to include a particular site in the plan inventory unless challenged by the Department, objectors or the Commission based upon contradictory information.

"(b) Delay Goal 5 Process: When some information is available, indicating the possible existence of a resource site, but that information is not adequate to identify with particularity the location, quality and quantity of the resource site, the local government should only include the site on the comprehensive plan inventory as a special category. The local government must express its intent relative to the resource site through a plan policy to address that resource site and proceed through the Goal 5 process in the future. The plan should include a time-frame for this review. Special implementing measures are not appropriate or required for Goal 5 compliance purposes until adequate information is available to enable further review and adoption of such measures. The statement in the plan commits the local government to address the resource site through the Goal 5 process in the post-acknowledgment period. Such future actions could require a plan amendment.

"(c) Include on Plan Inventory: When information is available on location, quality and quantity, and the local government has determined a site to be significant or important as a result of the data collection and analysis process, the local government must include the site on its plan inventory and indicate the location, quality and quantity of the resource site (see above). Items included on this inventory must proceed through the remainder of the Goal 5 process."

(Emphasis in original.)