Argued and submitted September 17, affirmed on petition of Home Builders (A90112); reversed and remanded in part and affirmed in part on petition of Callison (A90098) December 24, 1996, petition for review in CA A90112 denied June 3, 1997 (325 Or 403)

Elizabeth CALLISON,
*Petitioner,*

*v.*

LAND CONSERVATION AND DEVELOPMENT
COMMISSION
and City of Portland,
*Respondents.*

HOME BUILDERS ASSOCIATION OF
METROPOLITAN PORTLAND,
*Petitioner,*

*v.*

LAND CONSERVATION AND DEVELOPMENT
COMMISSION
and City of Portland,
*Respondents.*

(95-PR/00447, 95-PR00448; CA A90098, A90112)
(Cases Consolidated for Opinion Only)

929 P2d 1061

Peggy Hennessy argued the cause for petitioner Elizabeth Callison. With her on the brief was Reeves, Kahn & Eder.

G. Frank Hammond argued the cause for petitioner Home Builders Association of Metropolitan Portland. With him on the brief were Jeff H. Bachrach, Kenneth D. Helm and O'Donnell Ramis Crew Corrigan & Bachrach and John A. Chandler.

John Bagg, Assistant Attorney General, argued the cause for respondent Department of Land Conservation and Development. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Ruth M. Spetter, Senior Deputy City Attorney, argued the cause for respondent City of Portland. With her on the brief was Jeffrey L. Rogers, City Attorney.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

### WARREN, P. J.

These consolidated cases involve challenges to orders that the Land Conservation and Development Commission (LCDC) issued on its periodic review of the City of Portland's (the city's) acknowledged comprehensive plan. *See* ORS 197.628 *et seq.* One order approved the city's Goal 5[1] plans for a number of natural resource areas; the other established a work order for the city to complete its remaining Goal 5 periodic review tasks. Petitioners Elizabeth Callison (Callison) and Home Builders Association of Metropolitan Portland (Home Builders) challenge those plans from different directions.[2] We affirm on Home Builders' petition and reverse and remand on Callison's first assignment of error.

The plans in issue focused on streams, forests, wetlands, and other natural areas within the city's limits. In developing the plans, the city divided portions of its territory into a number of areas, defined primarily by watersheds,.and then divided each of those areas into a number of resource sites based on the particular topography of each site.[3] Using aerial photographs, it located forest and stream areas in those resource sites, plotted the areas on maps, and identified a large number of specific resource locations. Staff persons then visited each of the specific locations and filled out a Wildlife Habitat Assessment form for the location. In the forms, they identified the water, food, and cover resources at each location, together with the extent of disturbance and the existence of rare habitat and significant flora and fauna. The forms required the observer to evaluate a number of factors

---

[1] Goal 5 (Open Spaces, Scenic and Historic Areas, and Natural Resources) has as its purpose to "conserve open space and protect natural and scenic resources." The Goal and its related rules establish a process by which the appropriate governmental entity is to identify those resources and to make conscious decisions about the extent of protection to give them.

[2] Callison contends that the city gave the resources too low a level of protection, while Home Builders contends that the city included too much land in the protection zones.

[3] Home Builders criticizes the city's designation of resource sites that together encompass entire planning areas instead of being limited to the specific locations within each planning area that actually contain the Goal 5 resources. However, Home Builders does not assign the city's actions as error, and we therefore treat the sites that the city designated as appropriate for the purposes of these plans.

on a numerical scale, resulting in an overall score for the resources at each specific location.[4]

The city thus included much of the land within its boundaries in its inventory of resource sites, but it identified actual resources, to which it would apply the Goal 5 process, only within limited portions of each resource site. The Goal 5 process required the city, based on the inventory and a subsequent analysis of the economic, social, environmental, and energy (ESEE) consequences of the possible uses of each location, to make a decision about the level of protection that each location should receive. Under the applicable Goal 5 rule, OAR 660-16-010, that decision would be to do one of three things: (1) The city could determine that the resource site is so important, relative to the conflicting uses, and that the ESEE consequences of allowing conflicting uses are so great that "the resource site should be protected and all conflicting uses prohibited[.]" OAR 660-16-010(1). For historical reasons, this decision is known as a "3A" decision. (2) The city could determine that the conflicting use should be allowed fully despite the effects of that use on the resource site. OAR 660-16-010(2). This is known as a "3B" decision. (3) The city could determine that the resource site and the conflicting uses are important relative to each other and that it should therefore balance the ESEE consequences to allow the conflicting use in a limited way in order to protect the resource site to some extent. OAR 660-16-010(3). This is known as a "3C" decision. Although "3A" and "3B" decisions, once made, are relatively simple, the city can make a broad variety of "3C" decisions, some of which will protect the resource site more than others.

In this case, the city placed some locations in an environmental protection (EP) overlay zone,[5] some in an

---

[4] The specific locations did not include all of the resource areas within the designated resource sites. LCDC correctly noted that it was impractical to require the city to identify and justify every detail of every line that it drew, in part because the city focused on watersheds, which consist largely of streams and other linear resources that stretch narrowly over a significant distance. Home Builders attacks the city's ultimate zoning as insufficiently precise, but it does not assert that any specific locations, either those that the city investigated or others that it did not, are incorrect or ask that the city justify them further.

[5] An overlay zone modifies some of the regulations on the land within its boundaries while leaving the underlying zoning otherwise intact. Although an

environmental conservation (EC) overlay zone, and decided not to apply any overlay zone to others. As we discuss below, EP and EC zoning are different kinds of "3C" decisions. Failing to apply an overlay zone is a "3B" decision. The city generally zoned stream beds and nearby areas EP and zoned areas farther away from the stream beds EC. Among other effects, this zoning restricted or prohibited building on about two percent of the land that the city had previously identified as available for residential construction.

We begin by considering the challenges that Home Builders makes. It first challenges the inventory, arguing that under Goal 5 the essential elements of location, quality, and quantity of resources must "converge" before a site is worthy of inclusion. In this case, Home Builders claims, the city looked only at location and failed to show that the locations that it selected had a quantity and quality of resources that would justify inclusion.[6] According to Home Builders, the city simply chose locations from aerial photographs, conducted cursory surveys on the ground, and then turned its predetermined locations, with insignificant modifications, into its inventory of sites.

■ Home Builders does not identify specific sites or locations that the city improperly included on the inventory. In the absence of some reason to believe that the city's process produced erroneous results, Home Builders' general attack on the process is not persuasive. Given the nature of the resources that the city wished to identify, its reliance on aerial photographs to locate them was reasonable. The specific locations that the city had to check within those areas were extensive. The procedure that it adopted was reasonably designed to determine the quantity and quality of the resources at each location and thus to allow the city to decide which to include on its inventory. The fact that the city's ultimate inventory was almost identical to its preliminary identification of locations does not show that the specific checking was meaningless. Indeed, that checking appears to have been

---

overlay zone may permit greater uses than the underlying zoning, the overlay zones involved in this case impose additional restrictions.

[6] We take this to be what Home Builders means when it says that location, quality, and quantity must "converge." That term does not have any clear meaning in this context.

essential to the later determination of whether a particular area should be zoned EP or EC or left without any overlay zone.

Home Builders next attacks the city's analysis of the ESEE consequences of resource zoning in these areas.[7] Relying on *Columbia Steel Castings Co. v. City of Portland*, 314 Or 424, 840 P2d 71 (1992), it asserts that the city failed to describe the ESEE consequences of resource protection with sufficient particularity and to consider the interaction between specific conflicting uses at specific resource sites. It refers in general to aspects of the Fanno Creek and Tributaries Conservation Plan in support of its arguments.

In *Columbia Steel Castings*, the Supreme Court held that an earlier version of one of the city's Goal 5 plans was inadequate, because the city failed to make a site-specific analysis of the ESEE consequences of applying a conservation overlay zone to the petitioner's property. Only after balancing the impacts that the resource site and the conflicting use have on each other could the city make a final decision on whether to protect the site completely or partially or to allow the conflicting uses without restriction. *See* OAR 660-16-010. The court summarized its holding by stating that

> "the Goal 5 implementing rules require that an ESEE analysis contain enough information on impacts that resource sites and conflicting uses will have on each other to permit the responsible jurisdiction to have 'reasons to explain why decisions are made for specific [resource] sites.' The reasons need be given only if a particular decision is challenged, but the reasons must *exist* at the time the land use decision is made. The reasons cannot exist if the local government's ESEE study was never sufficiently detailed." 314 Or at 432 (brackets and emphasis in original).

---

[7] Home Builders also argues that the city's zoning maps are insufficiently certain because they do not allow property owners to determine the precise portions of their property that are subject to the overlay zones. Any uncertainty is the result of the nature of the resources involved; unlike surveyed lots, forests and streams do not normally follow straight lines or make 90 degree corners. The maps are sufficient for property owners to determine whether there are resource zones on their lands and the general areas in which the zones exist. The city provides a process for determining the precise location of the resource zone if necessary.

Home Builders argues that the city did no more than create a boilerplate ESEE analysis that it applied to all resource sites in the Fanno Creek area in a "cut and paste" fashion. That analysis, it says, simply discusses general ecological issues without specific application to the details of each resource site. Home Builders states that the city failed to consider the "real world" interaction between identified Goal 5 resources and identified conflicting uses. LCDC responds that the applicable Goal 5 rule provides that a determination of the ESEE consequences of identified conflicting uses is adequate "if it enables a jurisdiction to provide reasons to explain why decisions are made for specific sites." OAR 660-16-005(2). The appropriate analysis, it states, is between actual conflicting uses and the Goal 5 resource.

■ The underlying difficulty with our ability to evaluate Home Builders' arguments is that it fails to discuss specific decisions that the city made. Neither the rule nor the Supreme Court's decision in *Columbia Steel Castings Co.* requires a fully articulated analysis of the interaction of conflicting uses and the Goal 5 resources for each specific resource location. Rather, they require that, when the city makes its decisions, it have reasons for its decision that it can explain *if an explanation subsequently becomes necessary.* Home Builders has not challenged the city's decision on any specific location and thus has not made an explanation of any specific decision necessary.

■ Home Builders is correct that the discussions of the ESEE consequences on each of the resource sites in the Fanno Creek plan are almost identical. There are, however, some differences that relate to the specific resource sites under discussion, and the general similarity may well be the result of the similarity of current zoning and land uses in all parts of the area. The rules do not require originality simply for the sake of originality.[8]

---

[8] Both Home Builders and Callison also assert that the criteria for development in the environmental zones are not clear and objective, because an environmental review process allows some discretion. We disagree. The primary criteria are clear and objective. Provision for a limited review, similar to a variance, that will ensure protection comparable to what the primary criteria provide does not make those criteria unclear or unobjective.

Home Builders concludes its brief with a number of assignments of error—more accurately described as arguments—all of which assert that in approving the Goal 5 plans LCDC allowed the city to move out of compliance with Goal 10 (Housing) and Goal 14 (Urbanization). It bases those arguments on its assertion that the city has placed at least two percent of its buildable lands inventory into environmental zones and thus removed it from availability for housing. That, Home Builders asserts, directly violates Goal 10. In addition, the loss of land in the city may require other cities in the Portland area to make up for the loss, possibly by expanding the metropolitan area urban growth boundary, and excluding the land thus allegedly violates Goal 14.

The Goal 5 rule requires the city to consider the effect of other statewide planning goals, where appropriate, as part of the Goal 5 process. OAR 660-16-005(2). It does not, however, describe *when* the city should consider that effect or what actions it should take. One of the orders that Home Builders challenges establishes a work plan for the city that includes a requirement that the city "[a]mend the residential buildable lands inventory to exclude lands within the 'E' zone." The completion date for that task was December 31, 1995; the record does not indicate the current status of the task, which, in any event, is not before us in this case.

■   The city and LCDC suggest that it is most appropriate to consider the Goal 10 and Goal 14 effects of removing lands from the buildable lands inventory in conjunction with that task.[9] We agree. If ensuring continuing compliance with those or other goals affects the natural resource plans at issue in this case, the city will have to make appropriate adjustments to those plans, subject to LCDC's approval and any judicial review. At present, Home Builders' arguments are premature. We affirm on the petition of Home Builders.

Callison's arguments focus on the protection of fish and riparian resources in several of the planning areas.[10]

_____

[9] In at least a few instances in the Goal 5 plans, the city expressly recognized the need to mitigate the loss of buildable land by providing alternative locations to replace those that were lost.

[10] Callison asserts that the city had to consider Goal 19 (Ocean Resources) because anadromous fish exist in several streams within the planning areas. Goal

Aside from the asserted application of Goal 19, *see* note 10 above, she argues that the city could not allow utility or other nonresource uses in the EP overlay zones and that, because streams are linear resources, it was obliged to apply EP rather than EC overlay zones to the entire length of all streams.

■     Callison first argues that EP zoning represents a "3A" decision to protect the resource fully. If she is correct, allowing utility or other nonresource uses would be inconsistent with that decision. In the plans, the city refers to EP zones as "highly restrictive" and as giving "full protection." At least once, in its February 1995 revisions with regard to site 104 in the Northwest Hills Natural Areas Protection Plan, it attempted to undertake a full Goal 5 analysis and treated application of the EP zone as a "3A" decision. However, although the EP zone may come close to a "3A" decision under Goal 5 and OAR 660-16-010, it does not provide for full preservation. It is, in fact, a "3C" decision that grants greater protection to the resource than does EC zoning, which is a less restrictive "3C" decision.

■     The relevant city ordinance expressly provides that the EP zone contemplates development, at least in "rare and unusual circumstances." Utilities are allowed in EP zones if they meet appropriate standards.[11] Indeed, in its brief LCDC insists that the nature of existing development requires utilities in those zones in some circumstances. Thus, the "rare and unusual" development and the provision for utilities are uses that limit the supposedly "full protection" that the zone purports to provide. As a result, a decision to use EP zoning is in fact a "3C" decision, *not* a "3A" decision.

The city's actions are similar to those of Hood River County in *1000 Friends of Oregon v. LCDC (Hood River Co.),* 91 Or App 138, 754 P2d 22 (1988). In that case, the county purported to make a "3A" decision while actually making a

19 applies to "the nearshore ocean and the continental shelf." The city is located well inland, and whatever obligations it may have to protect anadromous fish cannot derive from Goal 19. The city did in fact identify fish as a Goal 5 resource.

[11] The city's work plan calls for the development of clear and objective standards for utilities in the EC zone but does not refer to standards for utilities in the EP zone. It is not clear what general standards for development apply to the "rare and unusual circumstances" in which development is allowed in EP zones.

"3C" decision. We reversed LCDC's approval of the plan, commenting that a "limitation is *not* a prohibition." 91 Or App at 142 (emphasis in original). Without a prohibition of conflicting uses, there is no "3A" decision. The city's explanation, however, attempts to justify a "3A" decision, not a restrictive "3C" decision. We therefore reverse and remand for reconsideration on this point.[12]

On petition of Home Builders (A90112), affirmed; on petition of Callison (A90098), reversed and remanded on first assignment of error and otherwise affirmed.

---

[12] Callison's argument that, if the city applied EP zoning to any portion of a stream it had to apply the same zoning to the entire length of the same stream, fails because there is no reason to believe that EC zoning is necessarily insufficient to protect in-stream resources.