Argued and submitted June 12, 1997, affirmed February 11, petition for review denied June 30, 1998 (327 Or 317)

Fred HUMMEL,
Peg Reagan, Richard Calkins, Norman Yock,
Winharbor Farms, Citizens for Orderly Development
and 1000 Friends of Oregon,
*Petitioners,*

*v.*

LAND CONSERVATION AND
DEVELOPMENT COMMISSION,
*Respondent,*

*and*

CITY OF BROOKINGS,
Curry County, Itzen Enterprises, Inc.,
Harbor Construction, Ltd., Reservation Ranch
and U.S. Borax,
*Intervenors.*

(96-WKTASK-00610; CA A93624)

954 P2d 824

Mary Kyle McCurdy argued the cause for petitioners. With her on the brief was Mike Collmeyer.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Stephen T. Janik, Linly Ferris Rees and Ball Janik LLP filed the brief for intervenor City of Brookings.

M. Gerard Herbage filed the brief for intervenor Curry County.

Kenneth D. Helm and O'Donnell Ramis Crew Corrigan & Bachrach filed the brief for intervenor Itzen Enterprises, Inc.

Allen L. Johnson argued the cause for intervenors Harbor Construction, LTD., Reservation Ranch and U.S. Borax. With him on the brief was Johnson, Kloos & Sherton, P.C.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Petitioners seek review of an order of respondent Land Conservation and Development Commission (LCDC) on the expanded urban growth boundary (UGB) that the City of Brookings (the city) adopted as part of the periodic review of its comprehensive plan and land use ordinances. In its order LCDC generally approved the expanded UGB but also remanded the periodic review work task concerning the UGB to the city and to intervenor Curry County for certain modifications. Petitioners attack that order to the extent that LCDC approved the expansion of the UGB; the modifications that it required are not in issue. We affirm.[1]

The city is located in the extreme southwest corner of the state. It lies on the northwest side of the Chetco River, which enters the Pacific Ocean at the city's western border. The unincorporated community of Harbor lies directly across the river from the city. The city's current comprehensive plan, which LCDC acknowledged on January 27, 1983, established a UGB that includes the Brookings city limits, the community of Harbor, and a number of additional areas on the edges of those boundaries. That UGB presently contains over 9,000 residents. The Brookings area is expected to grow to over 16,000 people within the next 20 years.

In part because of the anticipated growth, the Department of Land Conservation and Development (DLCD) notified the city in mid-1992 to begin the periodic review process. In late July 1993, DLCD approved the city's periodic review program (work program), which identified a number of specific tasks (work tasks) and gave priorities and target dates for each. The numbered work tasks are: (1) to amend the UGB, among other things in order to provide a 20 year supply of vacant buildable land (priority A); (2) to establish an urban reserve boundary (priority B); (3) to amend the comprehensive plan and land use ordinances to deal with a number of issues, including the extension of the UGB resulting from work task 1 (priority C); (4) to adopt a public facilities

---

[1] LCDC has exclusive jurisdiction to review completed work program tasks. ORS 197.644(2). Action pursuant to that authority is a final order subject to our review under ORS 197.650. ORS 197.644(4)(a).

plan for the new UGB, including providing for extending public services to the newly included areas (priority D); and (5) to develop a transportation system plan (priority D). Each work task had a separate target date for completion. The later tasks depended in part on the earlier ones; for instance, the city was not to begin work on numbers 4 and 5 until it had completed number 1.

In its preliminary work on work task 1, the city concluded that, in order to accommodate the anticipated population growth and other needs, it had to add 899 acres of buildable land to the existing UGB. The city found some difficulty in locating the needed land because of the geographical character of the Brookings area, which is a narrow flatland between rugged hills on the east and the ocean on the west. Much of the urbanizable flat land was already inside the existing UGB. The city was able to find part of the needed additional land by expanding the UGB to include existing exception areas and a limited amount of resource land on the relatively flat areas north of the city. That additional land, however, was not sufficient to meet the city's need.

It was difficult, if not impossible, for the city to extend the UGB on flat land south of its previous limits, although it did add a few preexisting exception areas. Other than in those locations, the flat land south of Harbor, known as the Harbor Bench, is a small but highly productive agricultural area that, because of a unique combination of soil and climate, is, for all practical purposes, the only source of Easter lily bulbs and hydrangea stock in the country. The city could not include that agricultural land in the UGB.[2] East of Harbor and the Harbor Bench are the Harbor Hills, which have rugged, unbuildable western slopes and which are the source of the aquifer that supplies the agricultural areas on the Harbor Bench. The Harbor Hills rise directly from the Harbor Bench and are currently zoned forest grazing.

The city decided that the best location for additional vacant buildable acres was in the Harbor Hills. It therefore included a large portion of those hills, beginning directly east

---

[2] Indeed, LCDC's remand requires the city either to eliminate or, at the least, to reduce the size of two portions of the Harbor Bench that it originally included in the expanded UGB.

of the Harbor Bench agricultural lands and continuing over the top of the hills and down the other side, in the expanded UGB. It recognized that, because of their topography, the western slopes of that portion are not buildable. However, the city found that other sections of the area contain a significant amount of land that is buildable at a variety of price levels. It justified including the unbuildable land in the UGB on the grounds that that land was necessary in order to provide urban services to the buildable land and that excluding it would create a confusing boundary, with non-UGB land surrounding UGB land in an illogical pattern.

Petitioners' arguments are, in one way or another, attacks on the inclusion of the Harbor Hills area in the UGB. Because many of those arguments are based on LCDC's alleged failures to consider issues related to goals other than Goal 14, the urbanization goal, we first consider the nature of the issues before LCDC on its review of this specific periodic review work task. Although we have previously considered land use issues that arose in the context of a periodic review, with the one exception that we mention below we have not discussed the process involved or how the stages of that process affect DLCD's and LCDC's review of local government action or our review of LCDC's decisions.

The purpose of periodic review is to ensure that acknowledged comprehensive plans and land use regulations continue to achieve the statewide planning goals. Periodic review is appropriate when there has been a substantial change in circumstances so that the plan and regulations no longer comply with the goals, when implementation decisions lead to results inconsistent with the goals, or when there are regional or statewide issues that must be addressed in order to bring the plans and regulations into compliance with the goals. ORS 197.628. In short, the foundation of periodic review is that the previously acknowledged plan and regulations no longer qualify for acknowledgment, either on their face or as applied.

Periodic review has two major phases; each consists of a number of more minor steps. It is a process, not an event that occurs at a single time. The first phase is the evaluation

of the existing plan and its implementation and the development of a work plan to make needed changes in the plan and regulations. The work plan consists of a number of work tasks for the local government to perform over a designated period of time. Each work task, in turn, has a number of specific parts. The second phase is the completion of the work tasks outlined in the work plan. ORS 197.633(1). The first phase is complete when the local government adopts the work plan and DLCD approves it, subject to appeal to LCDC. ORS 197.633(3).

Because work plans consist of a number of work tasks, and because the later tasks often depend on the completion of the earlier tasks, the second phase of periodic review is a sequential process. Work tasks are subject to DLCD review and acknowledgment as they are completed, but the periodic review as a whole is not acknowledged until DLCD, and LCDC if there are any appeals, have reviewed and acknowledged all of the work tasks. As the statutes and rules recognize, the sequential nature of a work program means that work on a later work task may have an impact on a previously completed work task, even after its initial acknowledgment. Thus, LCDC may modify the approved work program when, among other things, issues of goal compliance are raised as a result of the completion of a work task that results in a need to undertake further review or revisions. ORS 197.644(1)(b). When a later work task conflicts with a work task that has been deemed acknowledged, or when a later work task violates a goal related to a previous work task, DLCD and LCDC will not approve the submission until all conflicts and goal compliance issues are resolved. OAR 660-25-140(5).

■    The periodic review process, thus, is designed to be sequential and interactive, with later decisions potentially requiring a reworking of previous decisions or previously acknowledged work tasks. The revised comprehensive plan and land use regulations must comply with all of the goals at the conclusion of the process, when they become effective. During the process, however, it may well be appropriate for a particular work task to focus on a limited number of goals. In this case, for instance, it would be difficult to comply with work task 4, requiring the preparation of a public facilities

plan, a task that implicates Goal 11, until the completion of work task 1, the expansion of the UGB, a task that primarily implicates Goal 14.

Only one of our opinions touches on the periodic review process as a process. In that opinion, we assumed that a decision on a later work task could require the reevaluation and revision of a previously-completed work task. In *Callison v. LCDC,* 145 Or App 277, 929 P2d 1061 (1996), *rev den* 325 Or 403 (1997), one petitioner argued that the City of Portland's adoption of Goal 5 natural resource plans had the effect of reducing the city's buildable homes inventory and thus violated Goals 10 and 14. We noted that the city had not yet completed the work task of amending its residential buildable lands inventory. We agreed with LCDC and the city that it was most appropriate to consider the Goal 10 and 14 issues in conjunction with that work task. "If ensuring compliance with those or other goals affects the natural resource plans at issue in this case, the city [of Portland] will have to make appropriate adjustments to those plans * * *." Because of the sequential and interactive nature of the periodic review process that we described in *Callison*, many of petitioners' arguments in this case are premature.

The nature of the periodic review process also affects the applicability of some of the LUBA and Court of Appeals opinions on which petitioners rely. The issue in those cases was the validity of an amendment to an acknowledged comprehensive plan. *See, e.g., 1000 Friends of Oregon v. City of North Plains,* 27 Or LUBA 372, *aff'd* 130 Or App 406, 882 P2d 1130 (1994). Unlike the periodic review process, plan amendments involve specific and limited changes to existing plans that are otherwise in compliance with the goals. An amendment is complete when approved and must, therefore, meet all requirements at that time. However, in a periodic review that is as thorough as this one, it is impossible for a general revision and expansion of the UGB fully to satisfy all requirements at this stage of the process in the same way that a specific, limited amendment to an existing and otherwise unevaluated UGB must.

In conducting a periodic review, the planning agency does not make one specific change in isolation; rather, it

reevaluates the entire situation in order to bring the plan and land use regulations back into compliance with the goals. That process is much closer to the original development and acknowledgment of the plan and regulations than to a plan amendment. At the end of the periodic review process, the entire plan and regulations, including the UGB, must fully comply with all requirements. At this stage of the Brookings process, however, we can determine only whether the UGB complies to the extent that it is possible for it to do so in light of the unknown results of the remaining work tasks.

In their various "assignments of error,"[3] petitioners argue that LCDC's qualified acknowledgment of the city's expanded UGB violated a number of the goals. We first consider their argument that it violated Goal 14, the urbanization goal, which describes seven factors to consider in establishing and modifying a UGB:

"(1)  Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2)  Need for housing, employment opportunities, and livability;

"(3)  Orderly and economic provision for public facilities and services;

"(4)  Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5)  Environmental, energy, economic and social consequences;

"(6)  Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7)  Compatibility of the proposed urban uses with nearby agricultural activities."

---

[3] An assignment of error is an assertion that the court or agency made an erroneous ruling or took an erroneous action. *See* ORAP 5.45 and Appendix H (giving examples). The only LCDC action that petitioners attack is its qualified acknowledgment of the city's expanded UGB. In each of their "assignments of error" petitioners assert that that action violated a goal or part of a goal. Petitioners present only one true assignment of error: that LCDC erred in approving the expanded UGB. The various other "assignments" that they assert are in fact different arguments in support of that single assignment.

Petitioners first argue that the expanded UGB violates factors 1 and 2 of Goal 14, the "need" factors, because it includes far more land than the city identified as necessary to provide for its probable growth in the next 20 years. Instead of the 771 acres that, according to petitioners, the city needs, it adopted a UGB that includes an additional 3,491 acres. Petitioners argue that it would be possible to find the needed acres entirely north of the Chetco River without including any part of the Harbor Hills. For that point they focus on two exception areas north of the city. They also attack LCDC's conclusion that it was necessary to add a large amount of unbuildable land in the Harbor Hills in order to reach and serve the buildable land in that area. They concede that that

> "argument would be legitimate *if* the City was compelled to include the Harbor Hills in order to meet its land needs of 771 acres - in order to reach the flatter, buildable portion of the Harbor Hills at the top of the Hills, urban services such as sewer and water lines would arguably have to be built across the large, unbuildable portion of the Harbor Hills." (Emphasis in original.)

By conceding that the city's argument would be legitimate if the city had to include the Harbor Hills to meet its need for buildable land, petitioners necessarily concede that the Goal 14 need factors would be satisfied in that event. That concession resolves this argument because, as respondents point out, petitioners misunderstand the record. The city in fact needs an additional 899 buildable acres, not 771, and the areas that petitioners identify north of the Chetco River are inadequate to satisfy *that* need. LCDC could also find that the excluded exception areas do not contain the amount of *buildable* land that petitioners suggest. For those reasons, it was necessary for the city to look to the area south of the river, which as a practical matter means the Harbor Hills. In light of those facts and in light of this concession, petitioners have not shown that LCDC erred on this ground in approving the city's expansion of the UGB in that area.

Petitioners next assert that the revised UGB fails to satisfy factor 3 of Goal 14, because there is no assurance that there will be an orderly provision of public facilities and services to the new area. However, work task 4 requires the city to develop a public facilities plan for the expanded UGB,

something that is also necessary to comply with Goal 11. Before adopting the expanded UGB, the city determined that it is feasible to provide the necessary public services to the expanded UGB and that they are in fact likely to be provided. That is sufficient at this point to support LCDC's conclusion that the city satisfied factor 3 of Goal 14. Any problems that developing the plan uncovers with the expanded UGB can be considered in connection with work task 4. If it does not prove possible to develop an appropriate plan for the expanded area, the city can then reconsider and modify its action on the UGB. In short, work on matters related to factor 3 will become more precise as the city works on its remaining periodic review work tasks.[4]

■      Petitioners next argue that the city failed to comply with the requirements for Goal 2 exceptions for the areas that it added to the UGB.[5] Goal 14 requires a change in a boundary separating urbanizable from rural lands to meet the requirements of the exceptions process of Goal 2.[6] There is no assertion that the Harbor Hills area satisfied the first, physically developed, or the second, irrevocably committed, ground for an exception. Petitioners recognize that satisfying the Goal 14 factors is sufficient to satisfy the first and fourth parts of the third, standards, ground.[7] Our discussion of the

---

[4] For similar reasons, LCDC did not err when it concluded that at this time the city satisfied factors 5, 6, and 7 of Goal 14 when it adopted the expanded UGB. We also reject petitioners' arguments based on Goal 2, Part I, Goal 10, and Goal 11.

[5] Goal 2 provides criteria and a process that permit planning for specific areas in ways that would violate one or more of the other goals. The result of the Goal 2 process is an exception to that other goal or goals. For example, an area that should otherwise not be urbanizable may be so built on or surrounded by urban uses that it is impractical to retain it in agricultural or forest use.

[6] We do not need to consider whether that requirement applies to an expansion that is part of the periodic review process as well as to amendments to an acknowledged UGB.

[7] The criteria for the standards ground are:

"(1)  Reasons justify why the state policy embodied in the applicable goals should not apply;

"(2)  Areas which do not require a new exception cannot reasonably accommodate the use;

"(3)  The long-term environmental, economic, social and energy consequences resulting from the use of the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

problems with petitioners' proposed alternative land north of the Chetco River shows that it met the second and third, "alternatives," part of this ground. The expanded UGB, therefore, qualifies for a Goal 2 exception, and we therefore reject petitioners' arguments based on the exceptions criteria of that goal.

We hold, thus, that LCDC did not err in approving the city's expanded UGB at this stage of the periodic review process. We express no opinion on whether actions that the city, DLCD, and LCDC may take at later stages of that process will require any reevaluation of that issue.

Affirmed.

---

"(4) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."