Argued and submitted October 28, 2019, affirmed on petitions and cross-petition January 23, 2020

RESTORE OREGON,
Bosco-Milligan Foundation/
Architectural Heritage Center,
Oregon Nikkei Endowment,
Portland Chinatown History Foundation/
Portland Chinatown Museum, and
Peggy G. Moretti,
*Respondents*
*Cross-Petitioners,*

*v.*

CITY OF PORTLAND,
*Respondent below*
*Cross-Respondent,*

*and*

GUARDIAN REAL ESTATE SERVICES, LLC,
*Petitioner*
*Cross-Respondent.*

Land Use Board of Appeals
2018072

OSB2LAN IVON, LLC
and Haithem Toulan,
*Petitioners,*

*v.*

CITY OF PORTLAND,
*Respondent.*

Land Use Board of Appeals
2018073, 2018086, 2018087;
A172000

459 P3d 703

This case is on judicial review from a Land Use Board of Appeals (LUBA) order addressing the City of Portland's adoption of its Central City 2035 Plan (CC2035). That plan, among other things, established new building height limits within the 10-block area of New Chinatown/Japantown Historic District (the district) and, to protect a scenic view of Mt. Hood, established new building height limits in an area on the east side of the Willamette River referred to as the Southern Triangle. LUBA affirmed the city's decision to adopt the plan

with respect to the challenges brought before LUBA, with one exception. LUBA remanded for the city to adopt findings that explain how the new height limits in the district comply with Portland Comprehensive Plan (PCP) Policy 4.48. Petitioner Guardian Real Estate Services, LLC, owner of property in the district, challenged on review LUBA's remand of the city's decision. Cross-petitioners challenged on review LUBA's rejection of their argument that the city failed to comply with the city's citizen involvement program in adopting the height limits in the district. Petitioners OSB2LAN and Haithem Toulan, owners of property in the Southern Triangle, challenged on review LUBA's rejection of their arguments that the city's Economic, Social, Environmental, and Energy (ESEE) analysis was inadequate to support the building height limits in the Southern Triangle. *Held*: (1) LUBA correctly applied its own standards of review in concluding that a remand was necessary for the city to adopt findings that explain how the new height limits in the district comply with Policy 4.48 and, thus, did not err; (2) LUBA did not err in concluding that the city had complied with its citizen involvement program when it adopted the new height limits in the district; and (3) LUBA did not err in concluding that the city's ESEE analysis was adequate to support the city's decision to protect the scenic view of Mt. Hood.

Affirmed on petitions and cross-petition.

E. Michael Connors argued the cause for petitioners. Also on the brief was Hathaway Larson LLP.

Timothy V. Ramis argued the cause and filed the brief for petitioner-cross-respondent.

Daniel H. Kearns argued the cause for respondents-cross-petitioners. Also on the brief was Reeve Kearns, PC.

Linly F. Rees argued the cause for respondent-cross-respondent. Also on the brief was Lauren A. King.

Kenneth P. Dobson filed the brief *amicus curiae* for Arbor Lodge Neighborhood Association, Downtown Neighborhood Association, Irvington Neighborhood Association, King Neighborhood Association, Laurelhurst Neighborhood Association, Northwest District Association, Pearl District Neighborhood, and Pearl Neighbors for Integrity in Design.

Before Ortega, Presiding Judge, and James, Judge, and Mooney, Judge.

ORTEGA, P. J.

Affirmed on petitions and cross-petition.

**ORTEGA, P. J.**

This case is on judicial review from a Land Use Board of Appeals (LUBA) order addressing the City of Portland's (city) Central City 2035 Plan (CC2035). To enact parts of CC2035, the city adopted Ordinance 189000 and Ordinance 189002. Those ordinances, among other things, established new building height limits within the 10-block area of New Chinatown/Japantown Historic District (the District) and, to protect a scenic view of Mt. Hood, established new building height limits in an area on the east side of the Willamette River between the Tilikum Crossing Bridge and the Ross Island Bridge (the Southern Triangle). Petitioners OSB2LAN IVON, LLC and Haithem Toulan (OSB), owners of property in the Southern Triangle, and cross-petitioners Restore Oregon[1] appealed the city's decision to LUBA, and petitioner Guardian Real Estate Services, LLC (Guardian), which owns property in the District, intervened. LUBA affirmed all of the parties' assignments of error, except for one. With respect to one of Restore Oregon's assignments of error, LUBA remanded Ordinance 189000 for the city to adopt findings that explain how the new height limits in the District comply with Portland Comprehensive Plan (PCP) Policy 4.48.

On review to this court, Guardian, Restore Oregon, and OSB each assign error to different parts of LUBA's order. Guardian argues that LUBA erred in remanding Ordinance 189000. Restore Oregon argues that LUBA erred in rejecting its assignment of error that the city failed to comply with the PCP citizen involvement program goals. OSB argues that LUBA erred in approving the Economic, Social, Environmental, and Energy (ESEE) analysis the city prepared to support the building height limits in the Southern Triangle. We review LUBA's order to determine if it is "unlawful in substance or procedure," ORS 197.850 (9)(a). Under that standard, we conclude that LUBA did not

---

[1] Cross-petitioners include Restore Oregon, Bosco-Milligan Foundation/Architectural Heritage Center, Oregon Nikkei Endowment, Portland Chinatown History Foundation/Portland Chinatown Museum, and Peggy G. Moretti. For ease of reference, cross-petitioners are referred to throughout this opinion as Restore Oregon.

err with respect to the disparate issues raised by petitioners and cross-petitioners. Thus, we affirm.

## I.  BACKGROUND FACTS

We take the following background facts from LUBA's order, which the parties do not dispute.

"The challenged ordinances [189000 and 189002] adopted amendments to the Central City Plan, which was originally adopted in 1988 as part of the Portland Comprehensive Plan (PCP). CC 2035 made a number of changes to the existing Central City Plan. ***

### "A.  New Chinatown/Japantown Historic District

"As relevant here, *** CC 2035 amended the height limits that apply to new buildings in the New Chinatown/Japantown Historic District (District), a ten square block area located west of the Willamette River and north of the downtown area that is listed on the National Register of Historic Places for its cultural and historical significance.

"The District was established in 1989. The base zoning of property in the District at the time it was established and today is Central Commercial Zone with a downtown development overlay. At the time the District was established in 1989, the maximum allowed building height in the District under the Portland City Code (PCC) was 350 feet plus a possible 75 feet of bonus height. New development in the District is subject to discretionary Historic Resources Review under PCC 33.846 and the city's adopted New Chinatown/Japantown Historic Design Guidelines (Guidelines), first adopted in 2017.

"CC 2035 decreased the existing height limits for four blocks on the northern edge of the District, located between NW Everett and NW Glisan Street and NW 5th and NW 3rd Avenue (North Blocks), from the previous limit of 425 feet (base 350 feet plus 75 feet of bonus height) to 200 feet of base height with no bonus height available. CC 2035 also increased the height on one block in the District, Block 33, located between NW Couch and NW Davis Street and NW 4th and NW 5th Avenue, from its previous maximum height of 100 feet to 125 feet of base height on the entire block, with an available affordable housing bonus on the west half of Block 33, to allow a maximum height of up to 200 feet on the west half of Block 33. [Guardian] owns Block 33.

"*****

"**B.    Southern Triangle**

"CC 2035 also amended the comprehensive plan and zoning map for other areas of the central city, including the area that includes OSB's approximately three-acre property located on the east side of the Willamette River, generally in the area between the Tilikum Crossing Bridge and the Ross Island Bridge (Southern Triangle). CC 2035 amended the plan and zoning map designations for OSB's property from Heavy Industrial (IH) to Central Employment (EX), with design and river overlays on the entire property, and river environmental and scenic overlays on a portion of the property. The EX zoning applied to OSB's property prohibits residential uses.

"CC 2035 adopted a Central City Scenic Resources Protection Plan as an update to the previously adopted (in 1991) city-wide Scenic Resources Protection Plan. The new area-specific plan added two scenic resources sites and adopted an Economic, Social, Environmental and Energy (ESEE) analysis. As part of the ESEE analysis, the city mapped and evaluated views and viewpoints within the resource sites, and grouped them into rankings based on quality and quantity. A view of Mt. Hood from the Tilikum Crossing bridge was identified as SW46. The city's ESEE analysis determined to protect the views of Mt. Hood from SW46 by limiting building height on OSB's property and some surrounding properties to 60 feet, and by limiting surrounding properties with similar height restrictions. Approximately two acres of OSB's property are subject to the 60-foot height limit, with one acre of OSB's property subject to a height limit of 100 feet with available bonus heights of up to 250 feet."

(Boldface in original; footnote and record citations omitted.)

Restore Oregon challenged Ordinance 189000. As relevant here, Restore Oregon argued that the city's findings were inadequate to explain how the new height limits in the District satisfied PCP Policy 4.48. Restore Oregon also argued, in a second assignment of error, that the city failed to comply with the PCP citizen involvement program goals. Guardian intervened in support of Ordinance 189000. LUBA determined that the city's findings were inadequate with respect to Policy 4.48 and remanded Ordinance

189000 on that basis. LUBA rejected Restore Oregon's second assignment of error.

OSB challenged both Ordinance 189000 and Ordinance 189002. As relevant here, OSB challenged the city's ESEE analysis, arguing that it failed to comply with Statewide Planning Goal 5 and its implementing regulations by using an inappropriate "area-wide" analysis, by using different building assumptions in the Southern Triangle as compared to other areas, and by failing to take into consideration evidence OSB had submitted about the development constraints on its property. LUBA rejected all of OSB's arguments.

Guardian, Restore Oregon, and OSB have all sought review of different aspects of LUBA's order. We address each of their assignments of error below, reviewing to determine if LUBA's order is "unlawful in substance or procedure," ORS 197.850(9)(a). We also discuss in more detail the city's actions and LUBA's order, as necessary to understand the disparate challenges the petitioners and cross-petitioners raise on review.

## II.   ANALYSIS

### A.   *The District New Building Height Limits*

We first address Guardian's petition and Restore Oregon's cross-petition, both of which challenge portions of LUBA's order relating to the new height limits in the District. With respect to those petitions, we start with Guardian's challenge to LUBA's remand of Ordinance 189000 for the city to adopt additional findings to comply with Policy 4.48.

### 1.   *PCP Policy 4.48*

To provide context for Guardian's challenge, we set out a fuller discussion of LUBA's order with respect to its remand of Ordinance 189000.

Because CC2035 includes a legislative amendment to the PCP, the city was required to find that the amendment is "consistent with the goals and policies of the Comprehensive Plan, Metro's Urban Growth Management Functional Plan, the Statewide Planning Goals, and any relevant area plans

adopted by the City Council." PCC 33.810.050(B). At LUBA, Restore Oregon argued that the city had failed to make adequate findings, and failed to develop an "adequate factual base" as required by Statewide Planning Goal 2,[2] that demonstrated that the city had complied with, among other PCP policies, Policy 4.48. That policy provides:

> "**Policy 4.48, Continuity with established patterns.** Encourage development that fills in vacant and underutilized gaps within the established urban fabric, while preserving and complementing historic resources."

(Boldface in original.)

With respect to Policy 4.48, the city adopted the following written findings:

> "224.   The Plan responds to the policy through new goals and policies specific to the Central City that call for: the rehabilitation and reuse of historic structures; historic district protection measures; and, incentives to encourage seismic upgrades and other rehabilitation measures for historic resources.
>
> "* * * * *
>
> "226.   The maximum heights within historic districts have generally been reduced, and in most cases bonus height provisions have been repealed to result in new development that is compatible with the existing scale and character of the Central City's historic districts.
>
> "227.   For instance, in the New Chinatown / Japantown Historic District heights in the northern four blocks have been reduced from a maximum of 350 feet, and the ability to bonus an additional 75 feet in height to a maximum of 425 feet, has been eliminated. Now the maximum height in that area is 200 feet with no ability to bonus to a greater height. Although one block in the district received bonus height to a maximum of 200 feet on the west half of the block and 125 feet on the eastern half of the block, it should be noted that the greater heights allowed on the west half of the block are adjacent to parcels that may build to 460 feet. Further, the new maximum height limits create a step

---

[2] Goal 2 calls for "a land use planning process and policy framework as a basis for all decision and actions related to use of land and to assure an adequate factual base for such decisions and actions." (Boldface omitted.)

down from these greater height allowances to the west of the New Chinatown / Japantown Historic District down to 100 feet maximum to the east of the site in question, and then eventually down to 75 feet to the properties located just east of the district.

"228.    Following Council proposing this amendment, testimony was received for and against the increased height. Some testifying was concerned that these heights would not be consistent with the rest of the scale of development elsewhere in the district. However, others noted that the block in question had long been underutilized and that redevelopment of the site would be a catalyst for investment throughout the district, following decades of neglect. In the end, council decided: 1) the heights proposed would still result in a step down from the urban form surrounding the district; 2) the increased height was necessary to incent redevelopment of a catalytic site; and 3) the issue of consistency was best left to the Landmarks Commission who remain charged with reviewing future development proposals on that site and elsewhere in the historic district.

"Thus, on balance, these amendments in New Chinatown / Japantown Historic District and all other Central City Historic Districts further the objectives of Policy 4.48 above."

In its order, LUBA agreed with Restore Oregon that the city's findings were inadequate to explain why the adopted maximum heights complied with Policy 4.48. LUBA explained:

"The findings do not describe 'the established urban fabric' of the District, do not describe the existing historic resources, and do not explain how 200-foot tall buildings would 'preserv[e] and complement[]' those existing historic resources. Rather, the findings focus on the importance of creating incentives for development of vacant parcels in the District, determine that the maximum heights in the District are lower than adjacent properties that lie outside the District boundary, and conclude that 'the issue of consistency was best left to the Landmarks Commission who remain charged with reviewing future development proposals on that site and elsewhere in the historic district.' Those findings are not adequate to explain that the maximum height limit of 200 feet in the District 'preserv[es] and complement[s] historic resources.' Because CC 2035 adopts

base and bonus maximum height limits that apply as of right to all new development across the District, the question of whether those base and bonus maximum heights 'preserv[e] and complement historic resources,' and thus comply with PCP Policy 4.48, is a question that the city council must answer. It may not be deferred to discretionary historic resources review of individual development proposals for compliance with the PCC criteria and the Guidelines.

"The city responds to Restore Oregon's argument that the 200-foot maximum height limits lack an adequate factual base with citations to a number of record pages. We have reviewed those citations. The material cited by the city is largely focused on maintaining the pre-designation height limits in the North Blocks to encourage development in the District, adopting new height limits to 'revitalize the area,' and arguing that the District is less of an architectural district and more a 'cultural' district. However, none of that evidence addresses the subject of PCP Policy 4.48, which is to '[e]ncourage development that fills in vacant and underutilized gaps within the established urban fabric, *while preserving and complementing historic resources.*' (Emphasis added.) Stated differently, the materials cited by the city are evidence that supports the city's findings regarding the '[e]ncourage [infill] development' prong of PCP Policy 4.48, but do not address the 'within the established urban fabric' or the 'while preserving and complementing historic resources' prongs. In particular, the city does not point to any focused evidence that supports a conclusion that the 200-foot maximum height limit 'preserve[es] and complement[s]' District resources."

(Brackets in LUBA's order; record citations omitted.) As a result, LUBA remanded Ordinance 189000 for "the city to adopt findings that are adequate to explain why the 200-foot height limit complies with PCP Policy 4.48. That decision must be supported by an adequate factual base."

On review, Guardian raises five assignments of error that reduce to a single complaint: LUBA misunderstood or misapplied its standards of review in remanding Ordinance 189000 to the city. More specifically, Guardian argues that LUBA failed to give appropriate deference to the city's interpretation of the PCP and Ordinance 189000, failed to correctly apply a standard of review for a *legislative*

land use decision, and failed to correctly apply its substantial evidence standard of review. Thus, we start with a discussion of LUBA's standards of review.

Ordinance 189000 amended the PCP and city land use regulations. LUBA's review of those amendments required it to reverse and remand the city's decision if the amendment to the PCP "is not in compliance with the [statewide land use planning] goals," ORS 197.835(6), and if the amendment to the land use regulations "is not in compliance with the comprehensive plan," ORS 197.835(7)(a). In conducting that review, LUBA is required to defer to the city's interpretations of its own plan and regulations if that interpretation is "plausible," *i.e.*, it is not "inconsistent with the express language of the comprehensive plan or land use regulation" or inconsistent with the underlying purpose and policies of the plan and regulation. ORS 197.829(1); *Siporen v. City of Medford*, 349 Or 247, 259, 243 P3d 776 (2010).

With respect to evidence in the record, Goal 2 requires that an amendment to a comprehensive plan or land use regulation be supported by an "adequate factual base." An "adequate factual base" for a legislative land use decision "is synonymous with the requirement that a decision be supported by substantial evidence." *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 268 n 11, 259 P3d 1021 (2011). LUBA determines if a decision is supported by substantial evidence by determining "'[i]f, viewing the record as a whole, a reasonable person could make the disputed factual finding.'" *Columbia Pacific v. City of Portland*, 289 Or App 739, 755, 412 P3d 258, *rev den*, 363 Or 390 (2018) (quoting *Stevens v. City of Island City¸* 260 Or App 768, 772, 324 P3d 477 (2014)).

In its first two assignments of error, Guardian argues that LUBA failed to give appropriate deference to the city's interpretation of Policy 4.48 and Ordinance 189000. With regard to Ordinance 189000, Guardian contends that LUBA's statement that the new 200-foot height limits in the District are allowed "as of right" failed to defer to the city's interpretation of Ordinance 189000. We reject that contention. First, contrary to Guardian's assertions about how the city interprets Ordinance 189000, the city also referred to

the 200-foot base height in the District as a height "allowed by right" in its commentary to the base heights maps that are appended to Ordinance 189000. Second, in echoing that language, LUBA did not make a finding or legal interpretation that the city had to allow 200-foot-tall buildings. Rather, LUBA's decision reflects an understanding that the 200-foot limit is a *maximum* height that *could be* allowed on those blocks, and that the maximum height could be adjusted downward on an individual development proposal basis. LUBA nevertheless explained that the fact that a particular proposed development could be adjusted downward did not answer the question whether the 200-foot height limit allowed by CC2035 complies with Policy 4.48. In so stating, LUBA did not fail to defer to a city interpretation of a land use regulation.

We next address and reject Guardian's argument that LUBA failed to defer to the city's "implicit" interpretation of Policy 4.48. In its remand to the city, LUBA discussed what it understood Policy 4.48 to require, but did not discuss whether the city had itself interpreted the policy. Guardian thus argues that LUBA's order ignores the city's implicit, plausible interpretation of Policy 4.48. Guardian asserts that the city implicitly interpreted Policy 4.48 to require only that it identify the "vacant and underutilized gaps" in the established urban fabric, and not to require a description of that urban fabric. Guardian further argues that LUBA should have deferred to the city's interpretation of Policy 4.48 that "one compliant method to preserve and complement existing historic resources * * * is to incent redevelopment of a vacant surface parking lot in order to catalyze reinvestment in the surrounding decaying historic structures."

The city did not make the implicit interpretations of Policy 4.48 that Guardian ascribes to it. Focusing on the step-down allowances within the District, the city stated that the 200-foot height limits were "compatible with the existing scale and character" of the District. However, the city did not address the "scale and character" of existing buildings in the District or how the new heights were compatible. Instead, the city found "the issue of consistency is best left to the Landmarks Commission who remain charged

with reviewing future development proposals on that site and elsewhere in the historic district." Although that discussion does suggest that the city made an implicit interpretation of Policy 4.48, it is not the one suggested by Guardian. The city's findings more logically suggest that it interpreted Policy 4.48 to require the new heights be compatible with the "scale and character" of the existing urban fabric and historic resources.

It is the city's findings pertaining to the step-down allowances and its related implicit interpretation that LUBA found inadequate, explaining that the city failed to describe the established urban fabric, the existing historic resources, or how the 200-foot maximum height "preserve[s] and complement[s]" those historic resources. LUBA also stated that the city could not rely on later Historic Landmarks Commission review of individual development proposals as a way for CC2035 to currently comply with Policy 4.48. LUBA's remand is compatible with the city's implicit interpretation of Policy 4.48, and, thus, LUBA did not err in the manner argued by Guardian.

In its third and fourth assignments of error, Guardian asserts that LUBA misunderstood or misapplied its substantial evidence standard of review when it concluded that the city's findings that it complied with Policy 4.48 were not supported by an "adequate factual base," as required by Goal 2.[3] In addressing Guardian's argument, "[w]e review 'LUBA's application of the substantial evidence rule for legal correctness and do[] not review the evidence independently for substantiality.'" *Columbia Pacific*, 289 Or App at 756 (quoting *Reinert v. Clackamas County*, 286 Or App 431, 446, 398 P3d 989 (2017)). "Thus, where LUBA 'properly articulates the substantial evidence standard of review, we will affirm unless the evidence is so at odds with [LUBA's] evaluation that we can infer that [LUBA] misunderstood or

---

[3] In its third assignment of error, Guardian also argues that the city adequately considered Policy 4.48, citing to testimony in the record to support that argument. To the extent Guardian is arguing that we should determine for ourselves whether substantial evidence supported the city's decision, we reject that argument, because it is not our role to do so on review of a LUBA order. *Columbia Pacific*, 289 Or App at 756. Rather, our role is to determine if LUBA correctly applied its own substantial evidence standard of review. *Id.*

misapplied the proper standard.'" *Id.* (quoting *Barkers Five, LLC v. LCDC*, 261 Or App 259, 348, 323 P3d 368 (2014) (brackets in *Columbia Pacific*)).

Here, LUBA correctly articulated its standard of review, and Guardian does not argue otherwise. Rather, Guardian argues that "the record evidence is so at odds with LUBA's evaluation" that LUBA clearly misapplied its standard of review. That is so, argues Guardian, because the record, when viewed as a whole, contains substantial evidence that the city considered all aspects of Policy 4.48 in adopting the height limits. Guardian supports its argument with record citations, primarily to hearing testimony and statements by the city commissioners and the mayor.

Applying our standard of review, we conclude that nothing in the record is "so at odds with" LUBA's decision that we can infer that LUBA misunderstood or misapplied the substantial evidence standard. LUBA explained that none of the evidence cited by the city addressed the "within the established urban fabric" text in the policy or supported a conclusion that the 200-foot maximum height "preserve[s] and complement[s] historic resources." None of the evidence cited by Guardian requires a different conclusion. Significantly, as pointed out by LUBA, and as addressed below, 301 Or App at 782-84, the change to a 200-foot maximum height "was introduced and discussed at the very end of a multi-year planning process, prior to which nearly all of the focused testimony focused on a maximum 125 or 160-foot height." LUBA's order demonstrates that LUBA understood and correctly applied its standard of review.

Finally, we reject Guardian's argument that LUBA applied a more exacting standard of review than it should have, because the city was making a legislative land use decision, and not a quasi-judicial one. First, the city did not identify conflicting policies and then make a decision that harmonized or chose between those conflicting policies. In other words, it did not make an interpretation of its plan or regulations to which LUBA was required to defer and, thus, such a decision was not on review at LUBA. Second, we conclude that LUBA correctly articulated the standards of

review for a legislative land use decision and applied those standards to its review of the city's decision.

Accordingly, we affirm LUBA's remand of Ordinance 189000 on Guardian's petition.

2.  *PCP Citizen Involvement Program Goals*

We next address Restore Oregon's cross-petition, which also concerns the city's adoption of the 200-foot height limits in the District. Restore Oregon argues that the city failed to comply with the PCP citizen involvement program goals when it adopted those heights, and that LUBA erred in concluding otherwise. LUBA summarized the process that led to the adoption of the 200-foot height limitations:

"The 200-foot height limit was proposed at the end of an almost ten-year process that, in part, considered new height limits in the District. The city's planning staff initially developed a concept plan for updates to the existing Central City Plan. The concept plan became a discussion draft of the CC 2035 plan, and the city's Planning and Sustainability Commission (PSC) held two public hearings and nine work sessions on the draft plan. That process resulted in the PSC's recommended draft plan in June 2017, which recommended for the entire District 125-foot maximum building heights with no bonuses available.

"The city council held several public hearings on the draft plan between September 2017 through April 2018. During the March 22, 2018 city council meeting, the city council accepted public testimony on the proposed CC 2035 height limits. Prior to that meeting, height limits of 125 feet had been the focus of much of the discussion, although some discussion focused on 160-foot height limits. The mayor proposed an amendment (C1) to the previously proposed plan to increase the maximum building height limit on the west half of Block 33 to 160 feet. Thereafter, a city commissioner proposed an amendment (C2) to increase the maximum building height on the west half of Block 33 to 200 feet, and to increase the Floor Area Ratio (FAR) on the entire block from 6:1 to 9:1. No vote was called on either motion.

"At the next city council meeting on April 4, 2018, another commissioner proposed an amendment (C3) to increase the maximum height on the west half of Block

33 to 160 feet through bonus height available through an affordable housing bonus. At the conclusion of that meeting, the city council passed the Cl amendment that adopted a maximum building height on the west half of Block 33 of 160 feet.

"A further amendment that would allow maximum building heights of 200 feet was noticed on the agenda for the city council's May 24, 2018 meeting. Opponents of the proposed new amendment and a 200-foot height limit submitted letters in opposition, but no public testimony was taken at the May 24, 2018 meeting. At that meeting, the same commissioner who proposed the C2 amendment proposed a new amendment that would (1) allow a maximum building height of 200 feet on the North Blocks, with no bonus height available, and (2) allow base building height for Block 33 of 125 feet but allow an affordable housing bonus building height of up to 200 feet on the west half of Block 33, and increase the base FAR to 9:1 on all of Block 33 if all floors above the ground floor on the west half of the block are developed with a residential use. An oral vote was taken and the amendment passed. At its meeting on June 6, 2018, the city council voted to adopt CC 2035."

(Record citations omitted.)

The city made written findings with respect to the PCP citizen involvement program goals. Those findings summarized the different ways that community involvement was sought and obtained during the process that led to the final recommended draft of CC2035. The city then concluded that "the plan and this public engagement process are consistent with Goals 2.A - 2.G of the [PCP]."

At LUBA, Restore Oregon argued that the city's decision failed to comply with Goals 2.C and 2.E when it did not allow public testimony at the May 24, 2018, city council meeting, at which the 200-foot maximum height limit was reintroduced, discussed, and adopted. LUBA rejected Restore Oregon's argument. First, LUBA accepted, as plausible, the city's implicit interpretation of Goal 2.E "to not require the city to accept public testimony in response to every motion or amendment made on a legislative proposal in order to satisfy the requirement to allow 'meaningful participation.'" LUBA then stated that "[n]othing in Goal

2.E suggests that closing the final hearing on a legislative amendment to the comprehensive plan to testimony is inconsistent with Goal 2.E." Likewise, LUBA agreed with the city that "nothing in Goal 2.C requires the city to accept public testimony in a legislative proceeding, in response to a motion or amendment."

On review, Restore Oregon asserts that LUBA erred, because the city's process violated Goals 2.C and 2.E.[4] Restore Oregon argues that the city failed to provide a "meaningful opportunity to participate in and influence *all stages* of planning and decision making," as required by Goal 2.E (emphasis Restore Oregon's), when the city did not take public testimony at the May 24, 2018, city council meeting.[5] Restore Oregon also argues that LUBA erred in deferring to the city's implicit interpretation of that goal, because that interpretation reads "meaningful and critical operative terms out of these policies and denied those most affected by this last-minute major amendment any opportunity to respond[.]"

The city responds that it complied with its citizen involvement program, consistent with Statewide Planning Goal 1, and that Restore Oregon has not pointed to any law or authority that provides that the city was required to reopen the record and take additional testimony before voting on the amendment. The city further responds that it plausibly interpreted Goals 2.C and 2.E to not require community participation after every amendment made during the final deliberations. As context, the city points out that

---

[4] Restore Oregon also suggests that the city violated Goal 2.G and PCC 3.02.040(G). Restore Oregon did not raise at LUBA that the city violated PCC 3.02.040. *Barnes v. City of Hillsboro*, 239 Or App 73, 81, 243 P3d 139 (2010) ("Generally, a party must raise an issue to LUBA to preserve it for judicial review." (Internal quotation marks omitted.)). In addition, Restore Oregon did not develop an argument at LUBA, or now on review to us, that applies to the text of Goal 2.G. *See id.* (Neither a court or LUBA are "obligated to make or develop a party's arguments when the party does not endeavor to do so itself."). As a result, we do not address those provisions.

[5] We note that Restore Oregon asserts several times that there was no prior notice of the amendment, calling it a "surprise" amendment. However, Restore Oregon also acknowledges that the noticed agenda for the May 24, 2018, meeting provided that the amendment would be considered, and, as a result, interested parties submitted written letters in opposition of the amendment in advance of the meeting.

PCC 33.740,[6] which governs the city's process for legislative land use decisions, allows the city council to modify proposals after public testimony has been heard and closed.[7]

In addressing Restore Oregon's argument, we first point out what citizen involvement the city allowed with respect to the District building height limits. As acknowledged by Restore Oregon, setting the building height limits in the District was the subject of a significant amount of public testimony prior to the May 24, 2018, city council meeting. Restore Oregon took the position that buildings taller than 125 feet should not be allowed and asserted that, even at that height, it would be difficult to design a building that would be compatible with the District. Also, parties submitted letters in opposition to the amendment to make the heights 200 feet before the May 24, 2018, city council meeting. Restore Oregon's argument narrows to this: The city's failure to take *further* public testimony on height limits in the District *during* the May 24, 2018, meeting violated the PCP citizen involvement program goals. With respect to that issue, we conclude that the city plausibly interpreted the PCP goals as not requiring that further public testimony.

We, like LUBA, must defer to the city's interpretation of its comprehensive plan and land use regulations, unless we determine that the city's interpretation is inconsistent with the express language, purpose, or underlying policy of the comprehensive plan or land use regulation. *Siporen*, 349 Or at 259. That standard of review is "highly deferential" to the city, and the "existence of a stronger or more logical interpretation does not render a weaker or less

---

[6] PCC 33.740.030(C) provides:

"Council decision. At the conclusion of its hearing, the Council may adopt, modify, or give no further consideration to the recommendation. If the decision is to adopt a Code or policy change which was originally authorized by ordinance, the Council must enact its decision by ordinance."

[7] The city also argues that Restore Oregon is claiming that the city made a procedural error and, thus, had to demonstrate that such error prejudiced Restore Oregon's substantial rights. *See* ORS 197.850(9)(a) ("The court shall reverse or remand [LUBA's] order only if it finds: (a) The order to be unlawful in substance or procedure, but error in procedure is not cause for reversal or remand unless the court finds that substantial rights of the petitioner were prejudiced thereby."). Because we conclude that there was no error, we do not address that argument.

logical interpretation 'implausible.'" *Mark Latham Excavation, Inc. v. Deschutes County*, 250 Or App 543, 555, 281 P3d 644 (2012). Our task then is to determine whether the city's implicit interpretation that Goals 2.C and 2.E did not require it to take further public testimony plausibly accounted for the text and context of those goals.

Goal 2.C provides:

> "**Value community wisdom and participation.** Portland values and encourages community and civic participation. The City seeks and considers community wisdom and diverse cultural perspectives, and integrates them with technical analysis, to strengthen land use decisions."

(Boldface in original.)

Goal 2.E provides:

> "**Meaningful participation.** Community members have meaningful opportunities to participate in and influence all stages of planning and decision making. Public processes engage the full diversity of affected community members, including under-served and under-represented individuals and communities. The City will seek and facilitate the involvement of those potentially affected by planning and decision making."

(Boldface in original.)

Restore Oregon's arguments are directed to the text of Goal 2.E, asserting that "meaningful opportunities to participate in and influence all stages of planning and decision making" required the city to take public testimony at the May 24, 2018, hearing. Neither Goal 2.E nor any other goal required public testimony at that hearing. The city gave the community, including Restore Oregon, meaningful opportunity to participate and influence the city's decision at all stages of the CC2035 planning, including on height limits for the District, as documented by the city in the record. LUBA did not err in deferring to the city's interpretation of Goals 2.C and 2.E and in concluding that, under that interpretation, the city met those goals.

Accordingly, we affirm LUBA's order with respect to Restore Oregon's cross-petition.

B.    *The Southern Triangle New Building Height Limits*

          We finally turn to OSB's challenge to the new building height limit of 60 feet that CC2035 places on part of its property in the Southern Triangle to protect a scenic view. In three assignments of error, OSB argues that LUBA erred in concluding that the city's ESEE analysis was adequate to support the city's decision. Before addressing those assignments of error, we first provide additional legal and factual context for OSB's arguments.

     1.    *The City's ESEE analysis*

          Statewide Planning Goal 5 is a land use planning goal to protect natural resources and conserve scenic and historic areas and open spaces. OAR chapter 660, division 23, provides the procedures and criteria for applying Goal 5 when amending a comprehensive plan and land use regulations. Because the city sought to amend its comprehensive plan with respect to its inventory of scenic resources, the city was required to comply with OAR 660-023-0030 (inventory process), OAR 660-023-0040 (ESEE decision process), and OAR 660-023-0050 (programs to achieve Goal 5). OAR 660-023-0230(2).

          As part of the inventory process, the city updated its Central City Scenic Resources Inventory to include the "Viewpoint Boundary" as a resource site. The Viewpoint Boundary includes scenic resources of "[v]iews, viewpoints, view streets, scenic corridors, visual focal points and scenic sites located within the CC2035 boundary" and "also views from viewpoints located outside of the CC2035 boundary," which were included "because development or vegetation within the CC2035 boundary may impact the view." The city mapped and evaluated those scenic resources to determine which were "significant" and assigned quality grading to each resource. As relevant here, river viewpoints were ranked as Group A, B, or C. The viewpoint at issue here—SW46—has a view of Mt. Hood from the Tilikum Crossing Bridge and was ranked with high scores and placed in Group A.

          For the ESEE decision process, under OAR 660-023-0040, the city was required to "develop a program to

achieve Goal 5 for all significant resource sites based on an analysis of the economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." OAR 660-023-0040(1). "ESEE consequences" are "the positive and negative economic, social, environmental, and energy (ESEE) consequences that could result from a decision to allow, limit, or prohibit a conflicting use." OAR 660-023-0010(2). The city was then required to "determine whether to allow, limit, or prohibit identified conflicting uses for significant resources sites" based on the ESEE analysis. OAR 660-023-0040(5). Here, the city's ESEE analysis is lengthy and detailed, so we only summarize the portions most relevant to OSB's arguments.

The city identified the conflicts with the significant scenic resources generally as "the height, mass, extent and location of structures and vegetation." The city then conducted an analysis of the ESEE consequences of those conflicting uses. We only discuss the city's economic analysis because that is the focus of OSB's arguments. Part of the economic analysis sought to determine the reduction in development value and job capacity that would result from restricting building height in view corridors. The city set out a methodology that identified specific conflicting uses by comparing the view corridor needed to protect a view with currently allowed building heights and mass in that corridor. To do so, the city identified allowable building heights, floor to area ratios (FARs), and average lot coverage percentages for 10 different city districts. However, because some areas did not have current zoning with height limits set, the city used assumptions. For the Southern Triangle, the city used assumptions of 200-foot base height, 3:1 FAR, and 80 percent lot coverage, which the city explained was a conservative approach. The city also explained that it applied a taller base height to the Southern Triangle than elsewhere in the Central Eastside because "there are larger 'super' blocks and it would be possible to reconfigure these sites to have tall towers on portions of the site."

Applying that analysis, the negative economic effect of protecting views of Mt. Hood from the Willamette River

were particularly high because those view corridors were not previously protected with building height limits. The analysis identified SW46 as one of the views of Mt. Hood from the river that had the least negative economic effect because "[m]any of the [buildable] sites in the Southern Triangle are larger than the standard block size in Portland. This provides flexibility in designing buildings and moving the tallest parts of buildings outside of view corridors."

The ESEE report then made general ESEE recommendations. "The general ESEE recommendation * * * [wa]s intended to balance across the factors to optimize the positive, negative and neutral consequences associated with conflicting uses. The purpose of the general ESEE recommendation is to set policy direction for categories of scenic resources." For Group A river views of Mt. Hood, the general recommendation was to prohibit structures or vegetation that blocks or substantially encroaches on the view. The ESEE then took those general recommendations and adjusted and clarified them as to the site-specific views.

SW46 received a site-specific decision to "[p]*rohibit* conflicting structures and vegetation within [the] view corridor to Mt. Hood" and "[l]*imit* conflicting structures and vegetation within [the] view corridor to Willamette River, Ross Island Bridge, and South Waterfront skyline." (Emphases in original.) The report explained:

> "This view from the western bump-out on the south side of Tilikum Crossing looks south up the Willamette River toward the Ross Island Bridge. Mt Hood is also visible. Ross Island, the South Waterfront, the West Hills, multiple buttes, and the riverbank are secondary focal features. Tilikum Crossing is one of the few bridges with separated bicycle and pedestrian lanes as well as pedestrian bump-outs, creating a safe place for viewers to stop and enjoy the view. The view from CCSW46 is ranked Group A.

> "The general ESEE recommendation for Group A views is to prohibit conflicting structures and vegetation within view corridors to Mt Hood, Mt St Helens, or bridges, and to limit conflicting structures and vegetation within view corridors to other primary focal features. Due to the location of this viewpoint on Tilikum Crossing out over the Willamette River, there's no potential for structures or vegetation to

block the view of the Willamette River, Ross Island Bridge, or the South Waterfront skyline. However, structures or vegetation on the east side of the river have the potential to block a view of Mt Hood. This viewpoint was included in the larger analysis of views of Mt Hood from bridges and the Greenway Trail. The results of that economic analysis for views of Mt Hood from the Willamette River results in a ESEE recommendation for CCSW46 to prohibit conflicting uses within the view corridor to Mt Hood (shown in red). The general ESEE recommendation stands for the river, bridge, and skyline (shown in yellow)."

The city's program to achieve the protection for SW46 included applying a scenic overlay zone. With respect to OSB's property, approximately two of its three acres are in the scenic overlay and are limited to 60-foot building heights with no bonus height available. The other acre of OSB's property, which is outside of the overlay zone, is limited to 100-foot building heights with an available bonus of up to 250 feet. In addition, CC2035 amended the zoning of OSB's property from Heavy Industrial (IH) to Central Employment (EX), which prohibits residential uses.

### 2. *LUBA's order*

At LUBA, OSB argued that the city's ESEE analysis was flawed and failed to comply with Goal 5 and its implementing regulations. OSB argued that the city used an impermissible "area-wide approach" in its ESEE analysis that was rejected as insufficiently specific in *Columbia Steel Castings Co. v. City of Portland*, 314 Or 424, 840 P2d 71 (1992) (*Columbia Steel*). LUBA rejected that argument, distinguishing the impermissible ESEE analysis used in *Columbia Steel* from that used here. Further, LUBA determined that the city's ESEE analysis complied with OAR 660-023-0040(4), because that regulation allows the approach used by the city to analyze separate districts or subareas, including the Southern Triangle, within the single Viewpoint Boundary resource site.

OSB also argued that the ESEE analysis impermissibly used different assumptions for the Southern Triangle, resulting in an undervaluation of the economic effects of protecting the SW46 corridor. LUBA rejected that argument,

agreeing with the city that the ESEE analysis accurately estimated the economic effects. LUBA agreed with the city that the city's assumptions in its analysis estimated a greater economic effect in the Southern Triangle than if the city had used the assumptions that it applied in other areas of the Central Eastside.

Finally, as relevant on review, OSB argued at LUBA that the city's ESEE analysis was inaccurate and underestimated the economic effects on OSB's specific property. In particular, OSB argued that the substantial environmental remediation costs that will be incurred to develop the property makes development cost-prohibitive with the CC2035 restrictions on building heights and prohibition on residential uses. LUBA also rejected that argument, concluding that

> "[n]othing in OAR 660-023-0040(4) *** requires the local government to consider the cost of environmental remediation for properties with conflicting uses, or requires the level of specificity OSB argues is required. In fact, the rule allows the city to analyze the ESEE consequences based on the entire resource site. Accordingly, OSB's arguments provide no basis for reversal or remand."

On review, OSB argues that LUBA erred with respect to those three issues. We address each in turn below.

3. *OSB's Petition on Review*

OSB first argues that LUBA misapplied the applicable law when it determined that the city's ESEE analysis was consistent with Goal 5 and OAR 660-023-0040. In particular, OSB argues that the city's analysis was inadequate under the Supreme Court's opinion in *Columbia Steel*. The city argues that *Columbia Steel* has no application because it was decided under OAR 660, division 16, which does not control here; rather, OAR 660, division 23 controls. We agree with the city that *Columbia Steel* has limited applicability, because its holding was based, at least in part, on rule text that is not in OAR 660, division 23. However, because it provides useful framing for OSB's argument about the specificity required for an ESEE analysis, we begin with a short discussion of that case.

In *Columbia Steel*, the city had conducted an ESEE analysis for a part of the Columbia Corridor that encompassed 14,000 acres. The city had divided that area into five subareas and then identified and inventoried 36 resource sites within those subareas. The ESEE analysis was conducted on each of the five subareas, and not on a resource-site by resource-site basis. 314 Or at 426-28. The petitioner argued that the analysis was not sufficient because it was not location specific. The court held that the then-applicable rule in OAR 660, division 16, "requires that a conflicting use and an ESEE analysis be done for each resource site." *Id.* at 431. To meet that requirement, the court stated that an ESEE analysis must "contain enough information on impacts that resource sites and conflicting uses will have on each other to permit the responsible jurisdiction to have 'reasons to explain why decisions are made for specific [resource] sites.'" *Id.* at 432 (quoting OAR 660-16-005 (1990)). The court remanded the case to LUBA to determine in the first instance if the ESEE was specific enough with respect to the particular resource site at issue to meet that requirement.

Here, OSB argues that the city's ESEE is inadequate under *Columbia Steel*, because the city designated the entire Viewpoint Boundary as a resource site and because the city determined economic impact based on averages for a district, instead of using the individual characteristics for affected property. OSB argues that LUBA erred when it concluded that *Columbia Steel* was distinguishable and that the city had complied with OAR 660, division 23.

We conclude that LUBA did not err. As noted, the holding OSB relies on in *Columbia Steel* is of limited applicability because it is based on inapplicable rule text. However, even putting that aside, OSB is mistaken when it asserts that *Columbia Steel* held that an ESEE analysis can never use area-wide considerations. Rather, that case held that an ESEE analysis needs to contain specific enough information so that the local government can conduct a meaningful analysis of the relative effects of the conflicting uses and the identified resource site on each other. The specificity that will be required is thus dependent upon what is being

analyzed. Here, LUBA concluded that the city's ESEE was specific enough to comply with Goal 5 and its implementing regulations, and we agree.

Although the city defined the Viewpoint Boundary as the resource site, the city, in fact, conducted analyses on a type-of-view basis (for example, Group A river views of Mt. Hood) to determine general recommendations, and refined those recommendations on a site-specific basis, to determine whether to prohibit, limit, or allow conflicting uses relative to a particular view corridor. That analysis included determining the negative economic effect of limiting conflicting uses within particular view corridors, including SW46.

Notably, OSB does not argue that that *process* was not specific enough; rather, OSB argues that the numbers used by the city in its economic-effect analysis were not specific enough because the city used district-wide average numbers instead of numbers specific to each property affected by a view corridor. However, nothing in Goal 5, the implementing regulations, nor *Columbia Steel* required the city to conduct such a narrowly-tailored analysis, and OSB points to nothing in that law that does require it. In particular, OAR 660-023-0040(4) contemplates that an ESEE analysis may be performed in a way that groups conflicting uses that are similarly situated:

> "The analysis may address each of the identified conflicting uses, or it may address a group of similar conflicting uses. A local government may conduct a single analysis for two or more resource sites that are within the same area or that are similarly situated and subject to the same zoning. The local government may establish a matrix of commonly occurring conflicting uses and apply the matrix to particular resource sites in order to facilitate the analysis. A local government may conduct a single analysis for a site containing more than one significant Goal 5 resource."

Here, the city's ESEE analysis was specific enough to comply with Goal 5 and its implementing regulations, and OSB has not pointed to anything in the law that supports its position that something more property-by-property specific was required.

In a second assignment of error, OSB argues that LUBA erred in concluding that it was permissible for the city to use different assumptions for base height, FAR, and lot coverage numbers in the economic-effects analysis for the Southern Triangle than assumptions used elsewhere in the Central Eastside, or than the averages of actual limits used for other districts. OSB also argues that the city's assumptions and values used for the Southern Triangle were factually flawed.

OSB's arguments reduce to a substantial evidence or substantial reason challenge to the city's decision to use the assumptions for the Southern Triangle that it did.[8] *Michaelson/NWDA v. City of Portland*, 296 Or App 248, 259-60, 437 P3d 1215, *rev den*, 365 Or 556 (2019) ("'Substantial reason' is a component of the substantial evidence standard of review and requires an explanation connecting the facts of the case and the result reached." (Internal quotation marks omitted.)). As set out above, we do not conduct a substantial evidence or reason review for ourselves. Rather, we review whether LUBA properly articulated and applied its own standard of review. *Columbia Pacific*, 289 Or App at 756. LUBA's standard of review was to determine "[i]f, viewing the record as a whole, a reasonable person could make the disputed factual finding." *Id.* at 755 (internal quotation marks omitted).

With respect to OSB's challenge, LUBA stated:

"We agree with the city that the ESEE analysis accurately estimated the economic impact to properties in the Southern Triangle, including OSB's property. OSB has not explained why the ESEE's assumptions regarding maximum building height, FAR, lot coverage, and dollars and jobs lost are incorrect or inaccurate for the Southern Triangle, or for OSB's property. In fact, we agree with the city that the ESEE estimated the economic impact to properties in the Southern Triangle that would be affected by protecting SW46 based on assumptions that led to a

[8] OSB also suggests that the city was prohibited by OAR 660-023-0040 from using different values in the Southern Triangle as compared to other districts or subdistricts. OSB, however, has not developed an argument that explains how that is so, nor did OSB preserve such an argument below. Thus, we do not address it further. *Barnes*, 239 Or App at 81.

conclusion of greater economic impact to those properties than if the ESEE used different assumptions that were applied in other areas of the central eastside."

OSB argues that LUBA's analysis is flawed because it was the city's burden to justify using a different methodology for the Southern Triangle, OSB showed that the base height numbers used by the city were inaccurate and based on flawed assumptions, and the ESEE assumptions were not more conservative than other districts. We reject those arguments. First, LUBA did not place any burden on OSB, except to explain its factual position on review and to point to evidence in the record to support it, which was appropriate. Second, OSB's arguments to us about LUBA's decision are directed only at the substantiality of the evidence in the record to support the city's findings and decision. That, as explained, is not our role. With regard to whether LUBA misunderstood or misapplied its application of its own substantial evidence standard of review, which is the question we must answer on review, OSB has not argued or demonstrated that LUBA erred, and we conclude that LUBA did not err in applying its own standard of review.

Finally, in a third assignment of error, OSB argues that the city erred in failing to take into consideration the evidence OSB submitted to the city that demonstrated that the ESEE analysis underestimated the economic effects on OSB's property. Specifically, OSB argues that the city failed to consider the substantial environmental remediations costs to redevelop OSB's property and the other development constraints that apply to OSB's property, including a river overlay setback, greenway trail, and other easements, which combine to make redevelopment cost prohibitive at the 60-foot height limit set to protect the view. OSB argues that, if the city had analyzed that true effect of protecting SW46, the negative economic-effect calculation would have been significantly higher. OSB further argues that LUBA erred in concluding that the city was not required to consider those issues, because OAR 660-023-0060 requires a local government to provide "opportunities for citizen involvement during the inventory and ESEE process," and OAR 660-023-0040(4) requires the ESEE to include all consequences that "could" result.

We begin with OSB's arguments regarding citizen involvement. OAR 660-023-0060 provides:

> "Local governments shall provide timely notice to land-owners and opportunities for citizen involvement during the inventory and ESEE process. Notification and involvement of landowners, citizens, and public agencies should occur at the earliest possible opportunity whenever a Goal 5 task is undertaken in the periodic review or plan amendment process. A local government shall comply with its acknowledged citizen involvement program, with statewide goal requirements for citizen involvement and coordination, and with other applicable procedures in statutes, rules, or local ordinances."

Here, OSB does not argue that the city failed to provide proper notice or failed to comply with its citizen involvement program or any other statute, rule, or local ordinance. OSB's argument is that the city did not use or respond to the information that OSB submitted in its ESEE analysis. However, the text of OAR 660-023-0060 contains no such requirement, and OSB does not provide a basis on which we could impose such a requirement. Moreover, as the city points out, the city documented and considered OSB's public testimony that the building height restriction, along with other constraints on the property, would make redevelopment impossible. The city, however, disagreed with OSB's analysis and determined that redevelopment was possible because 0.9 acres of OSB's property, the size of a full city block, is located outside of the view corridor, and other constraints, and can be built up to 250 feet with bonus height.

We next address OSB's argument with respect to OAR 660-023-0040(4). As stated by OSB, that rule provides, in part, that "[l]ocal governments shall analyze the ESEE consequences that *could* result from decisions to allow, limit, or prohibit a conflicting use." (Emphasis added.) However, as already discussed, that provision goes on to provide that the analysis need not be as specific as OSB contends:

> "The analysis may address each of the identified conflicting uses, or it may address a group of similar conflicting uses. A local government may conduct a single analysis for two or more resource sites that are within the same area or that are similarly situated and subject to the same zoning.

> The local government may establish a matrix of commonly occurring conflicting uses and apply the matrix to particular resource sites in order to facilitate the analysis. A local government may conduct a single analysis for a site containing more than one significant Goal 5 resource."

OAR 660-023-0040(4). OSB does not explain why it believes the text of that rule requires the city to respond, in the ESEE analysis, to the evidence it submitted on its property-specific environmental and development constraints. Accordingly, we also reject OSB's third assignment of error.

In sum, because OSB has not explained how LUBA erred as a matter of law and because LUBA correctly applied its standard of review in concluding that the city's ESEE decision was supported by substantial evidence in the record, we affirm LUBA's order with respect to OSB's petition.

Affirmed on petitions and cross-petition.